**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **OSPREY SHIP MANAGEMENT, INC.** § | | |
| **and CORMORANT SHIPHOLDING** § | | |
| **CORP.** § | | **PLAINTIFFS** |
| § | | |
| **v.** § | | **Civil No. 1:05CV390-HSO-RHW** |
| § | | |
| **JACKSON COUNTY PORT** § | | |
| **AUTHORITY,** *et al.* § | | **DEFENDANTS** |

<u>**ORDER AND REASONS GRANTING SECOND MOTION FOR SUMMARY
JUDGMENT AND DENYING AS MOOT FIRST MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT UNITED STATES OF AMERICA**</u>

BEFORE THE COURT are two Motions for Summary Judgment of

Defendant United States of America [the "U.S." or "Government"], filed June 29,

2007 [220-1] ["First Motion"], and November 20, 2007 [283-1] ["Second Motion"], in

the above-captioned cause.  Plaintiffs filed a Response Brief [258-1] to the First

Motion on July 30, 2007, and the Government filed a Reply [271-1].  Plaintiffs filed

a Response Brief [290-1] to the Second Motion on December 10, 2007, and the

Government a Reply [296-1].  After consideration of the submissions and the

relevant legal authorities, the Court finds the Government's Second Motion for

Summary Judgment [283-1] is well taken and should be granted.  The Court further

finds that the Government's First Motion for Summary Judgment [220-1] should be

denied as moot.

I. <u>FACTS AND PROCEDURAL HISTORY</u>

The M/V AMERICAN CORMORANT, an oceangoing heavy lift vessel owned

and/or operated by Plaintiffs, was scheduled to enter the Port of Pascagoula and

dock at a wharf referred to as the Old Grain Docks, Port of Pascagoula on August 15, 2004. *See* Compl., at ¶¶ 1-2, 32. In preparation for the call of the M/V AMERICAN CORMORANT at the Port of Pascagoula [the "Port"], representatives of Plaintiffs attended a "load out" meeting in early August 2004 with representatives of various Defendants to this action, including Don Foster and Joe Mosso, the harbor pilots who eventually piloted the M/V AMERICAN CORMORANT on the date of the incident at issue in this case. *See id.* at ¶ 24.

At approximately 0905 hours on August 15, 2004, Pilots Don Foster and Joe Mosso came aboard the vessel as the assigned compulsory pilots, and according to Plaintiffs, assumed primary responsibility for navigating the vessel to the Port. *See* Compl., at ¶¶ 29-30. At around 1100 hours, while maneuvering off the east bank of the Pascagoula River in the vicinity of Northrop Grumman Shipyard, the M/V AMERICAN CORMORANT was grounded and/or allided with a submerged object, which was later determined to be a submarine launchway Number 1 owned by Defendant Northrop Grumman Ship Systems, Inc. ["NGSS"]. The submerged launchway Number 1 extended from the shore of the east bank of the Pascagoula River. *See* Compl., at ¶¶ 31, 33A.

Submerged launchway Number 1 was originally built pursuant to a permit issued in 1939 by the United States War Department, the predecessor to the United States Army Corps of Engineers ["COE"], and extended 150 feet from the east bank of the Pascagoula River. *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 3. A series of subsequent permits issued by the War Department ultimately

authorized the length of the launchway to be either 368 or 458 feet from the shoreline.  *See id.;* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 9.[1]

Submerged launchway Number 1, or slipway Number 1, was at the time of this incident depicted by a set of brackets drawn where the launchway enters the Pascagoula River on Chart No. 11375, published by National Oceanic and Atmospheric Administration ["NOAA"].  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at pp. 5-6.  NOAA does not represent the underwater portion of the launchways on its charts.  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 6; Pls.' Resp. Br. on Subject Matter Jurisdiction, at pp. 6-7.  A depth sounding on Chart No. 11375 indicates a water depth of 6 feet at the end of launchway Number 1, where the allision occurred.  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 6.

Red Buoy No. 2, owned and maintained by Defendant NGSS, marked the submerged launchways as a private aid to navigation.  *See* Compl., at ¶¶ 15, 55.  The buoy appears on Chart No. 11375 as a privately-maintained lighted red buoy, labeled "Obstruction Buoy No. 2."  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at pp. 5-7.  The U.S. Coast Guard's Light List identifies Pascagoula River Obstruction Lighted Buoy No. 2 as a "private aid" and states that it "marks the outer edge of the submerged ways"; however, the Light List does not provide a

---

[1]  There is a dispute regarding the ultimate permitted length of launchway Number 1.  The dispute concerns permits issued in 1956 and 1957, specifically whether the 1957 permit allowed a 150 foot extension in addition to, or including, a 90 foot extension permitted in 1956.  *See* U.S.'s Reply Br. on Subject Matter Jurisdiction, at pp. 1-2.

geographical position for the buoy.  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 6.

The M/V AMERICAN CORMORANT incurred significant damage as a result of the allision with the launchway.  *See* Compl., at ¶ 31.  On August 9, 2005, Plaintiffs filed their initial Complaint, and with their Fourth Amended Complaint ["Complaint"] filed on October 6, 2006, Plaintiffs seek damages of $1,700,000.00, plus attorneys' fees, pre-judgment interest, survey, adjustment and underwriting expenses, and Court costs.  *See* Compl., at ¶¶ 58-59.

## II. <u>DISCUSSION</u>

### A.  <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 permits any party to a civil action to move for summary judgment upon a claim, counterclaim, or cross-claim as to which there is no genuine issue of material fact and upon which the moving party is entitled to prevail as a matter of law.  *See* FED. R. CIV. P. 56.

A party seeking summary judgment bears the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant carries its burden, the burden shifts to the non-movant to show that summary judgment should not be granted. *See id.* at 324-25.  The non-moving party may not rest upon mere allegations or denials in its pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.  *See Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 256-57 (1986).

B. <u>Motions for Summary Judgment of Defendant United States of America</u>

Plaintiffs named the United States, in its sovereign capacity, as a Defendant with respect to claims asserted against various agencies of the United States, including the COE, NOAA, and the United States Coast Guard ["Coast Guard"]. *See* Compl., at ¶¶ 17, 18; Pls.' Resp. Br. on Subject Matter Jurisdiction, at pp. 1-2. Plaintiffs filed this case pursuant to the Federal Tort Claims Act ["FTCA"], 28 U.S.C. § 1346, *et seq.*; the Suits in Admiralty Act ["SAA"], 46 U.S.C. app. § 741, *et seq.*; and/or the Public Vessels Act ["PVA"], 46 U.S.C. app. § 781, *et seq.*;[2] and related acts. *See* Compl., at ¶ 20.

Plaintiffs allege that agencies of the United States "failed to provide sufficient notices, publications or updates to mariners and users including notices to the local Pilots, Defendants Foster and Mosso, which would have indicated the specific location of the submerged launch ways, or the affected dimensions of the channel and stated water depths in the Pascagoula River." Compl., at ¶ 33E. Plaintiffs maintain that agencies of the United States

> promulgated, published and distributed Chart No. 11375 and authorized publication of the identical chart as British Admiralty Chart No. 3841, which provided incorrect information with respect to the placement of Buoy No. 2 and failed to provide or publish adequate notice of the hazards presented by the said submerged launch ways in the navigable waters of the Pascagoula River; and...failed to comply with mandatory guidelines or directives for soundings, surveys and chart publications.

---

[2] Prior to October 6, 2006, the SAA was cited as 46 U.S.C. app. § 741, *et seq.*, and the PVA cited 46 U.S.C. app. § 781, *et seq.* However, the SAA is now cited as 46 U.S.C. § 30901, *et seq.*, and the PVA as 46 U.S.C. § 31101, *et seq.*

Compl., at ¶ 33F; *see id.*, at ¶ 57.

Plaintiffs also allege that the United States is "further proportionately liable for failure of its agencies to enforce permit and other governing requirements for both the submerged hazard presented by the launch ways, and for the location, particulars and monitoring of Buoy No. 2." *Id.*, at ¶ 57.

In its First Motion for Summary Judgment, the Government argues that the Master of the M/V AMERICAN CORMORANT "was so remarkably negligent as to supersede any other negligence in causing the grounding." *See* U.S.'s Mem. in Supp. of its First Mot. for Summ. J., at p. 8.  The Government also asserts that none of its agencies or employees violated any duty to the vessel. *See id.*, at p. 12.   In its Second Motion for Summary Judgment, the Government invokes the Court's lack of subject matter jurisdiction over the claims asserted by Plaintiffs due to the applicability of the discretionary function exception to the waiver of sovereign immunity. *See*  U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at pp. 8-9.

Both the SAA and the PVA contain waivers of the Government's sovereign immunity.  Because there is no evidence in the record that the M/V AMERICAN CORMORANT is a "public vessel of the United States," and because the United States has not brought a civil action in admiralty for damages caused by a privately owned vessel, the Court is of the opinion that the PVA has no application to this case under the facts presented.  *See* 46 U.S.C. app. § 781 (46 U.S.C. § 31102).

The SAA authorizes suits against the Government in admiralty cases where such claims could be brought against a private party, but the SAA does not waive

immunity for discretionary acts of Government agencies that fall within the discretionary function exception set forth in the FTCA.  *See* 28 U.S.C. § 2680(a); *Theriot v. United States*, 245 F.3d 388, 396-97 (5th Cir. 1998); *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995) (holding that discretionary function exception applies to the SAA).

The FTCA's discretionary function exception is "implicit in private suits brought against the United States Government under the Suits in Admiralty Act." *Wiggins v. United States Through Dep't of Army*, 799 F.2d 962, 966 (5th Cir. 1986). Under this exception, the Government is not liable for "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  Whether this Court lacks jurisdiction to consider the Government's conduct in this case is a question of law.  *See Buchanan v. United States*, 915 F.2d 969, 970 (5th Cir. 1990).

C.   <u>The Court's Subject Matter Jurisdiction over Tort Claims against the Government</u>

Federal courts are courts of limited jurisdiction, *see* 13 CHARLES WRIGHT & ARTHUR MILLER, *Federal Practice and Procedure* § 3522 (1984), and must consider the question of subject matter jurisdiction *sua sponte* if it is not raised by the parties.  The Court must dismiss any action if such jurisdiction is lacking. *See* FED. R. CIV. P. 12(h)(3); *Matter of Kutner,* 656 F.2d 1107, 1110 (5th Cir. 1981), *cert. denied,* 455 U.S. 945 (1982).  "[J]urisdiction goes to the core of the court's power to

act, not merely to the rights of the particular parties.  If jurisdiction could be waived

or created by the parties, litigants would be able to expand federal jurisdiction by

action, agreement, or their failure to perceive a jurisdictional defect." *Giannakos v.

M/V Bravo Trader,* 762 F.2d 1295, 1297 (5th Cir. 1985).  "[W]hatever route a case

arrives in federal court, it is the obligation of both district court and counsel to be

alert to jurisdictional requirements. . . . [t]hat obligation is equally applicable to

cases initially filed in federal court and cases removed from state court to federal

court." *Grupo Dataflux v. Atlas Global Group, L.P.,* 541 U.S. 567, 593 (2004).

Federal courts are without subject matter jurisdiction to hear suits against

the United States unless there has been a waiver of sovereign immunity.  *See

United States v. Sherwood,* 312 U.S. 584, 591 (1941).   The FTCA, enacted by

Congress in 1946, is a limited waiver of sovereign immunity, making the federal

government liable to the same extent as a private party for certain torts of federal

employees acting within the scope of their employment. *See United States v.

Orleans,* 425 U.S. 807 (1976).  The FTCA generally removes the protection of

sovereign immunity for the Government in cases where its employees have caused

damage by their negligence during the course of their employment.  *See Aretz v.

United States,* 604 F.2d 417, 426 (5th Cir. 1979).

This waiver of sovereign immunity is subject to a number of exceptions,

among them the discretionary function exception, which makes the Government

immune from liability for:

[a]ny claim based upon an act or omission of an employee of the

> Government, exercising due care, in the execution of a statute or
> regulation, whether or not such statute or regulation be valid, or based
> upon the exercise or performance or the failure to exercise or perform a
> discretionary function or duty on the part of a federal agency or an
> employee of the Government, whether or not the discretion involved be
> abused.

28 U.S.C. § 2680(a).

The applicability of the discretionary function exception involves a two-step
analysis. First, because the exception covers only acts that are discretionary in
nature, there must be a determination of whether the challenged act involves an
element of "judgment or choice." *United States v. Gaubert,* 499 U.S. 315, 322 (1991);
*Berkovitz v. United States,* 486 U.S. 531, 536 (1988). This requirement is not
satisfied if a federal statute, regulation or policy specifically prescribes the course of
action that the Government employee must follow, for in this situation the
employee " 'has no rightful option but to adhere to the directive.' " *Gaubert,* 499 U.S.
at 322 (*quoting Berkovitz,* 486 U.S. at 536). However, if the relevant statutory
provisions leave to the judgement of the agency certain decisions regarding how to
proceed, such that the agency is not bound to act in a particular away, then the
discretionary function exception is nevertheless applicable. *See id.* at 329 (*citing
Berkovitz,* 486 U.S. at 536)*; see also Ashford v. United States*, - - - F.3d - - - -, 2007
WL 4418176, *2 (5th Cir. Dec. 19, 2007) (holding that for the exception to apply,
"the Government needs to establish there was 'room for choice' in making the
allegedly negligent decision.").

Second, if the action involves a choice or judgment, then a determination

must be made "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536.   The exception insulates Government decisions based on social, economic, and public policy. *See id.* at 636-37.  A Government regulation conferring discretion upon Government employees "creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324.  "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.   By fashioning an exception for discretionary governmental functions, including regulatory activities, Congress took 'steps to protect the Government from liability that would seriously handicap efficient government operations.'" *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814 (1984) (*quoting United States v. Muniz*, 374 U.S. 150, 163 (1963)).

Because the discretionary function exception covers only acts that involve an element of judgment or choice, whether the exception applies is governed by the nature of the conduct, rather than the status of the actor.  *See Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995) (*citing United States v. Gaubert,* 499 U.S. 315, 322 (1991)).   The discretionary function exception interposes a jurisdictional prerequisite to filing suit, which Plaintiffs must meet as part of their overall burden to establish subject matter jurisdiction.  *See, e.g., OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) ("since the government has asserted lack of subject

matter jurisdiction, OSI must prove that the discretionary function exception does not apply").

In this case, Plaintiffs' claims against the Government are based upon the alleged conduct of various agencies of the United States.  Because the Government has invoked its sovereign immunity, Plaintiffs must demonstrate the inapplicability of the discretionary function exception.  *See McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (holding, in qualified immunity case, that once defendant "invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense") (*citing Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001)); *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) ("since the government has asserted lack of subject matter jurisdiction, OSI must prove that the discretionary function exception does not apply").[3]  Plaintiffs have not adduced sufficient evidence to raise a genuine issue of material fact suggesting that the conduct complained of by various agencies of the Government was not encompassed by the FTCA's discretionary function

_____

[3] In considering the discretionary function exception to the Federal Tort Claims Act, the Fifth Circuit has repeatedly held that challenges to the court's jurisdiction are properly treated as motions to dismiss under Fed. R. Civ. P. 12(b)(1).  *See ALX El Dorado, Inc. v. Southwest Sav. and Loan Association/FSLIC*, 36 F.3d 409, 410 (5th Cir. 1994) (*citing  McNeily v. United States*, 6 F.3d 343, 347 (5th Cir. 1993)); *Davis v. United States*, 961 F.2d 53, 57 (5th Cir. 1991).  The burden of proving subject matter jurisdiction in those cases rested solely with plaintiffs.  *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (holding that "[t]he burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction).  Because discovery has been conducted in the present case and because the issue of this Court's jurisdiction is presented by way of a motion for summary judgment, the proper standard is whether there are no material facts in dispute and whether the discretionary function exception applies as a matter of law.  *See Ashford v. United States*, - - - F.3d - - - -, 2007 WL 4418176, *2 (5th Cir. Dec. 19, 2007).  However, the ultimate burden of establishing jurisdiction is nevertheless Plaintiffs'.  *See Ramming*, 281 F.3d at 161.

exception.

### 1.      Army Corps of Engineers

Plaintiffs assert that the COE failed to conduct an inspection of the launchway in question following construction pursuant to the last permit extension in 1958, and that the COE failed to publish information or notify mariners regarding the submerged hazard presented by the launchways.  *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at pp. 1-2.

### a.      Inspection of Submerged Launchway No. 1

Plaintiffs allege that the United States failed to enforce permit and other requirements for the submerged hazard presented by the launchways.  *See* Compl., at ¶ 57.  Specifically, Plaintiffs maintain that the launchway in question exceeded its permitted length, and that the COE failed to conduct a mandatory compliance inspection.  *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at pp. 1-2.

Submerged launchway Number 1 was originally built pursuant to a permit issued in 1939 by the United States War Department, the predecessor to the COE. It extended 150 feet from the east bank of the Pascagoula River.  *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 3.  Subsequently, a series of permits extended the authorized length of the launchway.  *See id.;* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 9.

As noted earlier, there is a dispute concerning whether a 1957 permit allowed a 150 foot extension in addition to, or including, a 90 foot extension granted in 1956. *See* U.S.'s Reply Br. on Subject Matter Jurisdiction, at pp. 1-2.  Plaintiffs contend

that the final permitted length of the launchway was 368 or 373 feet, and that the launchway as built exceeds the permitted length. *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 9. Construing the facts presented in Plaintiffs' favor for purposes of evaluating the pending Motions, and assuming that the launchway as built did exceed the permitted length, the question presented is whether the Government is nevertheless immune from suit.

While the Government states that the COE's policy for inspecting structures to ensure conformity with its permits "may have" changed since 1958, the COE indicates that it currently conducts "compliance inspections" of submerged hazards for which permits have been issued, such as the launchway. The Government contends that the decision whether to conduct these inspections is discretionary, and that inspections are only conducted on a randomly selected 25% of the permits issued, or where there is some indication that the permit is being violated. *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 4. The Government admits that "[t]here is no indication that a compliance inspection was ever undertaken by the Corps of Engineers with regard to Ingalls' Slipway No. 1." *Id.* However, it states that a COE inspection did occur on June 6, 1969, as evidenced by the Affidavit of T.O. Gaillard. *See* U.S.'s Reply Br. on Subject Matter Jurisdiction, at p. 6 (*citing* Aff. of T.O. Gaillard, Ex. "8" to NGSS's Rebuttal in Support of its Mot. for Summ. J. [184-5]).

"Plaintiffs ...acknowledge that the current regulation [regarding supervision by the COE of authorized activities] is discretionary and the provisions of 33 CFR §

-13-

326.4(b) indicate that it 'does not establish a non-discretionary duty to inspect permitted activities for safety, sound engineering practices,' or otherwise." *see* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 31 (*quoting* 33 CFR § 326.4(b)). Thus, the parties agree that the current regulation governing compliance inspections is discretionary.  This regulation, 33 CFR § 326.4, has been in force since before the date of the incident which is the subject of this case.  The parties do not dispute that 33 C.F.R. § 326.4 was in effect at the time of the allision.  Plaintiffs nevertheless contend that the regulation regarding operations shoreward of harbor lines which was in existence in 1958, but was no longer in force at the time of the allision in 2004, imposed a mandatory duty on the COE to ensure that the launchway structure, as built, did not extend further into the channel than authorized.  *See id.*, at pp. 31-32 (*citing* 33 CFR § 209.390).

As submitted by Plaintiffs, the 1958 regulation regarding operations shoreward of harbor lines, 33 C.F.R. § 209.390, read as follows:

> The establishment of a harbor line implies consent to riparian owners to erect structures to the line without special authorization by the Secretary of the Army but does not imply consent to operations of every kind landward of the line.  Such work as dredging for instance may seriously interfere with the regimen of the waterway and will ordinarily require the authorization of the Department to insure that operations are conducted under proper restrictions.  *District Engineers will therefore supervise operations landward of harbor lines sufficiently to assure themselves that all work proposed is either of the character authorized by the establishment of the line or has been properly authorized and that there is no encroachment channel-ward of approved limits.*  Where proposed structures are to touch or closely approach the harbor line the builder will be called upon to submit to the District Engineer in advance, plans of that portion of the proposed work which will be adjacent to the harbor line in order that the integrity of the line may be carefully

-14-

watched and maintained. *Every structure touching the harbor line or closely approaching it will be inspected upon completion and its location will be recorded on an office copy of the harbor line map or note made on the map showing where such data may be found.*

33 C.F.R. § 209.390 (1949), attached as Ex. "23" to Pls.' Resp. Brief on Subject Matter Jurisdiction, p. 11 (emphasis added).

The Government argues that "[w]ith regard to the 1958 Code of Federal Regulations' mandate that a project be inspected upon completion, there is a presumption of regularity granted to public officials by which, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" U.S.'s Reply Br. on Subject Matter Jurisdiction, at p. 6 (*quoting United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926)).  The Government also contends that while the "office copy of the harbor line map," upon which the results of the completion inspection required in 1958 would presumably have been recorded, is not in the COE's files these 49 years later, the burden of proving the violation of a mandatory regulation rests with Plaintiffs.  The Government asserts that Plaintiffs have presented no evidence to rebut the presumption that a completion inspection was properly conducted.  *See* U.S.'s Reply Br. on Subject Matter Jurisdiction, at p. 6.

As an initial matter, the Court finds that the current regulation, 33 CFR § 326.4, effective as of January 12, 1987, and not the superseded, 1958 regulation relied upon by Plaintiffs, controls.  The Government cannot be held liable for violating a regulation that was no longer in force at the time the allision occurred.  Plaintiffs admit that the current applicable regulation is discretionary in nature.

-15-

Thus, the discretionary function exception applies to, and the Government is immune from, Plaintiffs' claim regarding any alleged failure to inspect the launchway.   Even if the 1958 regulation were relevant and applicable, the language of this regulation does not appear to be mandatory to the extent that it left "room for choice" by employees of the COE in its enforcement.  *See Gaubert*, 499 U.S. at 329; *Ashford,* 2007 WL 4418176, at *2.  Moreover, the record indicates that there was at least one inspection of the launchway conducted by the COE in 1969, as evidenced by the Affidavit of T.O. Gaillard.  Nor is the Court of the opinion that Plaintiffs have presented sufficient evidence to overcome any presumption that Government employees discharged their duties.

The Court further finds that the judgment or decision regarding whether and/or how to inspect the submerged launchway in question is of the kind that the discretionary function exception was designed to shield, in that the decision involved one based on considerations by the COE of economic and/or public policy. *See Gaubert*, 499 U.S. at 322-23; *Berkovitz,* 486 U.S. at 536-37.  Considerations such as available resources and the relative risks to the public health and safety from alternative actions would have to be weighed in making the decision whether and/or how to inspect the launchway.  *See Theriot v. United States*, 245 F.3d 388, 400-01 (5th Cir. 1998).  The discretionary function exception precludes this claim.

### b.    Notices to Mariners and Charts

Plaintiffs allege that the COE failed to provide sufficient notices, publications or updates to mariners and users, including notices to the local pilots, regarding the

launchway.  *See* Compl., at ¶ 33E; Pls.' Resp. Br. on Subject Matter Jurisdiction, at

pp. 1-2.   Plaintiffs cite *Transorient Navigators Co. v. MS SOUTHWIND*, 714 F.2d

1358, 1367 n.7 (5th Cir. 1983), for the proposition that the "Corps of Engineers must

notify mariners of a submerged hazard of which it has knowledge."  *See* Pls.' Resp.

Br. on Subject Matter Jurisdiction, at p. 2.  Plaintiffs contend that such notices

would have indicated the specific location of the submerged launchways, or the

affected dimensions of the channel and stated water depths in the Pascagoula

River.  *See* Compl., at ¶ 33E.

> In *Transorient Navigators*, the Fifth Circuit stated that it did
>
> not construe the regulation as requiring the Corps to warn of every conceivable hazard arising from some change in the waterway.  However, *where as here the Corps creates, and therefore perhaps alone knows of, a submerged 90° cut in the channel, the regulation at least requires that the Corps take appropriate steps to notify mariners of this "change in channel conditions ... by dredging*" constituting "information of immediate concern to navigation."

*Transorient Navigators*, 714 F.2d at 1367 n.7 (emphasis added).

> The regulation considered and quoted by the Fifth Circuit in *Transorient*

*Navigators*, COE Regulation No. 1130-2-306 (May 8, 1978), reads as follows:

> 8.  Changes affecting navigation will be made promptly whenever information of immediate concern to navigation becomes known. Items of information especially desired are: (1) channel condition as revealed by surveys; (2) *changes in channel conditions, either by natural causes or by dredging or other work*; (3) changes in approved projects for improvement with statements of results expected from proposed operations; (4) descriptions of proposed dredging or other Federal work of improvement such as breakwater, pier, and revetment construction or alterations;
>  ...
> b.  Additional items of information desired are: (1) ... (2) unchartered shoals, and other obstructions to navigation and particulars as to

proposed or completed removal of same; (3) ... (4) ... (5) ... (6) established or existence of danger areas in navigable waters. Reproductions of drawings or sketches which will be helpful in interpreting the date [sic] shall accompany the reports. The reports will not be limited to a reference to an accompanying drawing or sketch, but *will contain a complete description in form suitable for publication in notices to mariners and the monthly supplements to the U.S. Coast Pilot*. In this respect, the reports will provide enough information that a single notification to navigational interests will suffice. *In the case of dredging or construction work, the mere statement that work will commence or has commenced on a certain date is insufficient*. All additional information possible, such as probable duration of operations and object of work, will be given. In the case of dredging, *extent of the area to be dredged and the depth expected will be provided....*

*Transorient Navigators*, 714 F.2d at 1365 n.3 (*quoting* COE Regulation No. 1130-2-306 (May 8, 1978)) (emphasis in original).

In *Transorient Navigators*, the Fifth Circuit did not view this regulation as requiring the COE to warn of every conceivable hazard, but rather, read it as requiring the COE to take "appropriate steps" to notify mariners in situations where the COE itself had created, and perhaps alone knew about, the changed submerged condition. The facts in this case are different. Moreover, what constitutes "appropriate steps" to notify mariners connotes an element of choice or judgment in carrying out the regulation. Nor is it clear from the record that this regulation, as cited in *Transorient Navigators*, was mandatory, or prescribed a set course of action, with no "room for choice" by the COE in its execution. The Court finds that the judgment or decision regarding whether and/or how to notify mariners of submerged objects is of the kind that the discretionary function exception was designed to shield. *See Theriot*, 245 F.3d at 400-01. Therefore, the discretionary function exception applies to this claim. *See Gaubert*, 499 U.S. at

-18-

322-23; *Berkovitz,* 486 U.S. at 536-37.

The Court is not persuaded that this regulation imposed a non-discretionary duty on the COE under the facts of this case, or that it was even in force at the time of the accident in question or at the time the launchway was built.  Nor is there any indication that this regulation required notice of preexisting dangers, which were already depicted on published nautical charts.

While not briefed by the parties, it appears that the regulation quoted by the Fifth Circuit in *Transorient Navigators* was superseded by Regulation No. 1130-2-520 on November 29, 1996.  Regulation No. 1130-2-520 contains similar provisions regarding special reports for changes affecting navigation.  However, the record is unclear regarding whether any similar regulation was in force prior to 1978, when the launchway in question was constructed.

Morever, the Court does read either the 1978 regulation or the 1996 regulation to require the COE to publish subsequent notice of a hazard which was already depicted on a published chart.  As more fully discussed in Section II(C)(2) below, the record supports the conclusion that the launchways themselves were properly depicted in accordance with NOAA guidelines on Chart No. 11375, which was published in 2002.  Therefore, the subsequent notice called for by Plaintiffs would not have been required.

### 2.    National Oceanographic and Atmospheric Administration

Plaintiffs allege that NOAA promulgated, published and distributed Chart No. 11375, and authorized publication of the identical chart as British Admiralty

Chart No. 3841, both of which purportedly provided incorrect information regarding the placement of Buoy No. 2.  They further assert that NOAA failed to provide or publish adequate notice of the hazards presented by the submerged launchways in the navigable waters of the Pascagoula River.  *See* Compl., at ¶¶ 33F, 57;  Pls.' Resp. Br. on Subject Matter Jurisdiction, at pp. 2-3.

Plaintiffs insist that the U.S. Department of Commerce Hydrographic Manual mandates that the abbreviation or symbol "obstr" shall be used to mark the location of submerged Launchway Number 1.  *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 2 n.6 (*citing* Hydrographic Manual, Publication 20-2 (1960), at 6-69, attached as Exhibit 1 to Pls.' Resp. Br. on Subject Matter Jurisdiction).[4] However, as the Government points out, a plain reading of the entire relevant section of the 1960 Hydrographic Manual does not indicate that such a notation was required on the charts at issue.  The cited Hydrographic Manual provision reads as follows:

> **6-69 Submerged obstructions.** – A variety of submerged obstructions is encountered in hydrographic surveying, all of which must-be [sic] shown on the *smooth sheet*.  Where least depths are not obtained on unnatural features such as stubs of piles, ruins of piers or other structures, wreckage of various kinds, they shall be shown by a 1-mm circle or dashed outline, in pencil and described.  *If the nature of the obstruction was not determined, the note "obstr" shall be used*[.] Dashed

---

[4]  In support of their respective positions, Plaintiffs and the Government both cite to various provisions of the Hydrographic Manual, Publication 20-2 (1960), specifically the third edition of the manual.  The Court notes that according to the website of the Office of Coast Survey, a component of the National Ocean Service, which is part of NOAA, there is a fourth edition published in 1976 that contains specifications and procedures for hydrographic surveying and includes updates through Change Number 3 (June 1981), but which is no longer in print.  *See* Office of Coast Survey, About Us, http://chartmaker.ncd.noaa.gov/staff/aboutus.htm (last visited January 10, 2008); Office of Coast Survey, Hydrographic Survey Products and Publications, http://chartmaker.ncd.noaa.gov/hsd/hsd-2.html (last visited January 10, 2008).

lines shall be used to indicate the extension below high water of marine railways, groins, breakwaters, outfall sewers, or other unnatural features rising above the bottom.

Hydrographic Manual, Publication 20-2 (1960), at 6-69, attached as Exhibit 1 to Pls.' Resp. Br. on Subject Matter Jurisdiction (emphasis added).

While the Government does not dispute that NOAA did not represent the underwater portion of the launchway, or slipway, on the charts in question, it contends that the above-cited requirements apply to "smooth sheets," and not to the formal, published version of a chart relied upon by mariners.  The Government explains in its Reply Brief that "[a] smooth sheet is not a nautical chart, but a tool used by hydrographers in compiling results of their surveys."  *See* U.S.'s Reply Br. on Subject Matter Jurisdiction, at p. 4.

Plaintiffs rely upon provisions 5-80 and 5-81 of the 1960 Hydrographic Manual, which do not appear to apply to the charts in question.  Provision 5-80 concerns how to conduct hydrographic surveys, but does not seem to impose any mandatory duty regarding the content or marking of the type of charts at issue in this incident. Provision 5-81 of the 1960 Hydrographic Manual addresses nonfederal aids to navigation.  It states, in relevant part, that "[a]ids to navigation which are established privately or by state or local governments shall be located on the hydrographic party, and their positions shall be shown on the *boat and smooth sheets*."  Hydrographic Manual, Publication 20-2 (1960), at 5-81, attached as Exhibit 1 to Pls.' Resp. Br. on Subject Matter Jurisdiction (emphasis added).

A smooth sheet is the final, carefully made plot of a hydrographic survey. In contrast to the boat sheet, which is a work sheet plotted during field

> operations from preliminary field data, the smooth sheet is plotted from corrected data and conforms with more rigid cartographic standards which are described in this chapter.
>
> After registry, verification, and review in the Washington Office, the smooth sheet becomes the official permanent record of that particular survey and is the principal authority for hydrographic data to be charted. The boat sheet is usually discarded after final administrative approval of the survey.

U.S. Department of Commerce Hydrographic Manual, Publication 20-2 (1960), at 6-1, attached as Exhibit "F" to U.S.'s Reply Br. on Subject Matter Jurisdiction.

Thus, the regulations from the 1960 Hydrographic Manual relied upon by Plaintiffs deal with required notations on the smooth and boat sheets, not on the published chart or charts upon which Plaintiffs or the Pilots in this case would have relied. These regulations are therefore inapplicable and do not support Plaintiffs' position that NOAA did not properly depict the launchways on Chart No. 11375.

Plaintiffs also contend that the Government should not be protected by the discretionary function exception because the symbol on the charts was inconsistent with the actual, known location of the launchway. Plaintiffs argue that "it was not possible to tell from the Official Chart where the underwater portions of the launch ways were located." Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 25 (*citing Sheridan Transportation Company v. United States*, 834 F.2d 467, 474 (5th Cir. 1987)). While the facts of *Sheridan* are distinguishable from those of the present case, as discussed in more detail in Section II(C)(3) below, the Court notes that Plaintiffs have not met their burden of pointing out to the Court which relevant and purportedly mandatory regulations required the inclusion of symbols depicting the underwater portion of the launchway on the chart in question, as opposed to on the

smooth or boat sheets.

According to the Government, the launchway was properly depicted on NOAA's Chart No. 11375 as a set of brackets where the launchway enters the water. *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at pp. 5-6. A depth sounding of 6 feet appears at the location of the underwater portion of the launchway with which the M/V AMERICAN CORMORANT allided. *Id.*, at p. 6.

The Government contends that Red Buoy No. 2 was properly shown by the appropriate symbol on Chart No. 11375, and that the Coast Guard's Light List, Volume IV, notes that it is a "private aid." *See* U.S.'s Mem. in Supp. of its Second Mot. for Summ. J., at p. 6. Chart No. 11375 also contained the following advisory: "WARNING: The prudent mariner will not rely solely on any single aid to navigation, particularly on floating aids. *See* U.S. Coast Guard Light List and U.S. Coast Pilot for details." Warning from Chart No. 11375, attached as Exhibit "O" to U.S.'s Mem. in Supp. of its Second Mot. for Summ. J. Thus, chart users were clearly on notice not to rely solely on floating navigational aids, such as buoys.

The Court is not persuaded that the Hydrographic Manual provisions cited by Plaintiffs are relevant or applicable in that they apparently contain requirements for "smooth sheets" and "boat sheets," and not for the published charts themselves. Plaintiffs have not pointed out to the Court which relevant and purportedly mandatory regulations were applicable to the chart in question, and they cannot rebut the Government's averment that NOAA's duty was discretionary. Therefore, this Court lacks subject matter jurisdiction over Plaintiffs' claims asserted against

NOAA.

3.   **U.S. Coast Guard**

Plaintiffs allege that the Coast Guard failed to enforce permit and other

requirements for the location and monitoring of Buoy No. 2.  *See* Compl., at ¶ 57;

Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 3.  The permits issued by the War

Department and the COE required that Ingalls Shipbuilding ["Ingalls"], the

predecessor of Defendant NGSS, consult with the Bureau of Lighthouses and its

successor, the Coast Guard, regarding which navigational aids should be displayed in

the vicinity of the launchways.  *See* U.S.'s Mem. in Supp. of its Second Mot. for

Summ. J., at p. 4.  Ingalls submitted two applications to the Lighthouse Service in

1940, one to install a lighted pile cluster and the other to place a buoy.  *See id.*  The

Government states that "[w]hile final approvals are no longer in any file, the fact that

Ingalls and Northrop Grumman have long maintained a buoy at the end of Slipway

No. 1 indicates that approval was granted."  *Id.*

Plaintiffs contend that while the Coast Guard inspected Red Buoy No. 2 on

June 2, 2004, before the allision, and found it to be "watching properly," the buoy was

nonetheless found to be 167 feet from its charted position on August 18, 2004.  *See*

Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 3.   Plaintiffs assert that "[w]hile

the decision whether to inspect Buoy No. 2 was discretionary, once the decision was

made, the actions of the government agents in the field are not shielded by the

discretionary function exception." Pls.' Resp. Br. on Subject Matter Jurisdiction, at p.

3.  Plaintiffs argue that the discretionary function exception is not applicable with

respect to the monitoring of the buoy placement.  *See*  Pls.' Resp. Br. on Subject
Matter Jurisdiction, at p. 22 (*citing Sheridan Transportation Company v. United
States*, 834 F.2d 467 (5th Cir. 1987) [hereinafter, "*Sheridan I*"]).

While the Plaintiffs heavily rely on the holdings of the *Sheridan* cases, they are
factually distinguishable from the instant case.  In *Sheridan I*, the Fifth Circuit
determined that the Government exercised discretion when it initially positioned a
buoy 60 feet from a sunken wreck and issued notice to mariners accordingly.  *See
Sheridan*, 834 F.2d at 473.  However, the Court determined that the Government did
not have discretion when it subsequently moved the buoy another 250 feet away from
the hazard without issuing any notice to mariners.  *See id.*  In considering whether
the relevant chart and light list were sufficient notice to mariners of the buoy move,
the Court determined that there was not sufficient notice given because there was no
sunken wreck symbol in the vicinity of the buoy or wreck, the visible wreck symbols
on the chart were irrelevant because the wrecks were totally submerged, and the
Light List subsequent to the move showed the buoy in the same position as it had
been prior to the move.  *See id.* at 474-75.

In the present case, the record supports the conclusions that the buoy was
privately maintained by NGSS and that the slipway symbol and depth soundings
utilized on the chart correctly indicated that there was a submerged launchway, or
slipway, that was a submerged hazard.  It further indicates that no agency of the
Government actively moved the buoy to a position farther away from the submerged
hazard or committed any affirmative act which made it more dangerous for mariners

in the area than if no action had been taken.

The Fifth Circuit later issued another opinion in the same case, *Sheridan Transportation Company v. United States*, 897 F.2d 795 (5th Cir. 1990) [hereinafter, "*Sheridan II*"].  This opinion, as well as subsequent United States Supreme Court and Fifth Circuit case law, reveal that the discretionary function holding in *Sheridan I,* as cited by Plaintiffs, is not applicable to the present case.  As recognized in *Berkovitz v. United States,* 486 U.S. 531 (1988), which was decided after *Sheridan I*, "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."  *Berkovitz,* 486 U.S. at 544.  However, if an agency makes a determination, as required by regulation, that was purportedly in error, the question of the applicability of the discretionary function exception "turns on whether the manner and method of [complying with the regulation] involve[d] agency judgment of the kind protected by the discretionary function exception."  *Id.* at 544-45.  If the relevant statutory provisions leave to the judgement of the agency certain decisions regarding how to proceed, such that the agency is not bound to act in a particular away, the discretionary function exception is nevertheless applicable.  *See United States v. Gaubert,* 499 U.S. 315, 329 (*citing Berkovitz,* 486 U.S. at 536); *see also Ashford v. United States,* - - - F.3d - - - -, 2007 WL 4418176, *2 (5th Cir. Dec. 19, 2007) (holding that for the exception to apply, "the Government needs to establish there was 'room for choice' in making the allegedly negligent decision.").

In this case, Plaintiffs argue that because the Coast Guard undertook to

periodically monitor the placement of Red Buoy No. 2, its alleged failure to properly monitor the placement of the buoy was not discretionary.   *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 23.   However, Plaintiffs do not point to any statutory or regulatory authority, discretionary or otherwise, which imposes any mandatory duty on the Coast Guard to monitor the placement of a privately-maintained buoy such as the one in this case.  The Court does not read *Sheridan I*, much less subsequent case law, so expansively as to take any alleged negligent action of a Government agency out of the discretionary function exception simply because the agency took that action.  For example, in *Sheridan I*, the regulation at issue was a Coast Guard regulation regarding the placement of wreck markers.  *See Sheridan I*, 834 F.2d at 474 (*citing* 33 C.F.R. § 62.25-40).  No such regulation has been cited here, where the navigational aid in question was privately maintained.  Further, even if simply initiating the monitoring of the buoy triggered a mandatory duty to act, the record does not support the conclusion that there was no "room for choice" by the Coast Guard in determining how to monitor the buoy.

Plaintiffs insist that "[o]nce the decision was made to inspect, [*Indian Towing Co. v. United States*, 350 U.S. 61 (1955)] dictates that the Coast Guard was required to do so in a non-negligent manner."  *See* Pls.' Resp. Br. on Subject Matter Jurisdiction, at p. 3.  In this case, unlike in *Indian Towing*, the aid to navigation was not maintained by the Coast Guard, but was privately maintained by Ingalls, and later by Defendant NGSS.  In *Indian Towing,* the Supreme Court explained that "it is hornbook tort law that one who undertakes to warn the public of danger and thereby

-27-

induces reliance must perform his 'good Samaritan' task in a careful manner."
*Indian Towing*, 350 U.S. at 64-65.

Unlike the negligent operation of a lighthouse by the Coast Guard in *Indian Towing*, Plaintiffs have produced insufficient evidence in this case to establish that the inspection of, or failure to inspect, Red Buoy No. 2 by the Coast Guard left mariners in any worse position than if the Coast Guard had not inspected the buoy at all. *See* REST 2d TORTS § 323 (1965) (stating that "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking").

The record contains insufficient evidence that the risk of harm to Plaintiffs was actually increased by the Coast Guard's inspection of the buoy.  Nor does the evidence support a finding that Plaintiffs suffered harm because they relied upon the undertaking.  Indeed, the record is devoid of evidence that Plaintiffs were ever aware of any Coast Guard inspection of the buoy until after the allision had occurred.  The "good Samaritan" doctrine is not applicable to the facts of this case.  *See id.*

Plaintiffs have presented insufficient evidence that the Coast Guard owed a duty to inspect the buoy in question beyond the scope of the verification conducted on June 2, 2004, or that any inspection by the Coast Guard was in violation of this

purported duty.  Rather, as Plaintiffs acknowledge, there was a discretionary duty

owed by the Coast Guard with respect to whether to inspect the buoy.  *See* Pls.' Resp.

Br. on Subject Matter Jurisdiction, at p. 3.  Plaintiffs have presented insufficient

evidence to rebut the Government's contention that the manner in which Coast

Guard personnel were to go about verifying the buoy's position and characteristics

left room for choice or judgment.  The Court is of the opinion that considerations such

as resources available to the Coast Guard and the relative risks to the public health

and safety from alternative actions would have to be weighed in deciding how to

verify the position and characteristics of the privately-maintained buoy, and thus, the

discretionary function exception applies.  *See Theriot*, 245 F.3d at 400-01.  Summary

judgment in favor of the Government on Plaintiffs' claims against the Coast Guard is

therefore required.

### III. <u>CONCLUSION</u>

This Court cannot assume jurisdiction where none exists.  After careful

consideration of the pleadings filed in this case and the history of the parties'

litigation of this issue, it is the opinion of the Court that Plaintiffs cannot meet their

burden of establishing this Court's jurisdiction over its claims against the

Government.  Consequently, Plaintiffs' claims against the Government are barred by

the FTCA's discretionary function exception, as incorporated into the Suits in

Admiralty Act.  The Court finds that there are no genuine issues of material fact with

respect to this pending Motion, and as such, the Government is entitled to judgment

as a matter of law.  Accordingly,

**IT IS ORDERED AND ADJUDGED** that, for the reasons cited herein, the Second Motion for Summary Judgment of Defendant United States of America filed November 20, 2007 [283-1], should be and is hereby **GRANTED,** and all claims asserted against Defendant United States of America, and any named agency thereof, are hereby dismissed with prejudice.   The First Motion for Summary Judgment of Defendant United States of America filed June 29, 2007 [220-1], is hereby **DENIED AS MOOT**.

**SO ORDERED AND ADJUDGED**, this the 16th day of January, 2008.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE

-30-