## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| OSPREY SHIP MANAGEMENT, INC. | § | |
| and CORMORANT SHIPHOLDING | § | |
| CORP. | § | **PLAINTIFFS** |
| | § | |
| v. | § | **Civil No. 1:05CV390-HSO-RHW** |
| | § | **In Admiralty** |
| | § | |
| DON FOSTER and NORTHROP | § | |
| GRUMMAN SHIP SYSTEMS, INC. | § | **DEFENDANTS** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 52

THIS CAUSE came before the Court on February 13 through 15, 21 through 22, 2008, and March 31, 2008, through April 4, 2008, for trial without a jury.  This is a suit in admiralty filed by Plaintiffs Osprey Ship Management, Inc. ["Osprey"], and Cormorant Shipholding Corp. ["Cormorant"] [collectively, "Plaintiffs"] pursuant to 28 U.S.C. § 1333.  Plaintiffs seek damages from Defendants Don Foster ["Pilot Foster"] and Northrop Grumman Ship Systems, Inc. ["NGSS"], arising out of an allision involving Plaintiffs' vessel, the M/V AMERICAN CORMORANT, which occurred on August 15, 2004.  Having considered the extensive testimony and evidence in this case, along with the parties' proposed findings of fact and conclusions of law and the relevant legal authorities, the Court is of the opinion that, by a preponderance of the evidence, Plaintiffs have established that Defendant Don Foster is liable to them for damages, but that Plaintiffs cannot maintain their claims against Defendant NGSS, such that these claims must be dismissed with prejudice.

## I. <u>PROCEDURAL HISTORY</u>

1.      This lawsuit arises out of an incident which occurred on August 15, 2004, wherein the vessel M/V AMERICAN CORMORANT allided with a submerged submarine launchway owned by Defendant NGSS.  Plaintiffs filed their Complaint [1-1] on August 9, 2005, originally naming as Defendants Colle Towing Company, Inc. ["Colle Towing"], the United States Army Corps of Engineers ["COE"], the National Ocean Survey and National Oceanic Administration [sic] ["NOAA"], the Jackson County, Mississippi, Port Authority ["JCPA"], Don Foster ["Pilot Foster"], Joe Mosso ["Pilot Mosso"], Randy Joplin, in his capacity as Harbormaster of the JCPA ["Joplin"], and Northrop Grumman Ship Systems, Inc. ["NGSS"].

2.      Plaintiffs filed a First Amended Complaint [5-1] against these same Defendants on August 12, 2005, and a Second Amended Complaint [26-1] against JCPA, Pilot Foster, Pilot Mosso, Joplin, NGSS, Colle Towing, and the United States of America [the "Government" or "USA"] on December 7, 2005.  On January 23, 2006, Plaintiffs asserted a Third Amended Complaint [50-1] against the same Defendants.  Plaintiffs filed a Fourth Amended Complaint [ 110-1] on October 6, 2006 [the "Complaint"], which added the Pascagoula Bar Pilots Association ["PBPA"], Michael C. Torjusen ["Torjusen"], Ronald T. Robertson ["Robertson"], Robert T. Baker ["Baker"], Fredrick A. Lundy, Sr. ["Lundy"], and Walter W. Gautier ["Gautier"], as Defendants.

3.      The Court subsequently granted summary judgment in favor of Defendants Colle Towing [284-1], Pilot Mosso [285-1], Pilots Baker, Gautier, Lundy,

Robertson, Torjusen, and the PBPA [288-1], JCPA and Joplin [289-1], and the United States and any named agency thereof [312-1], including the U.S. Army Corps of Engineers ["COE"], NOAA, and the U.S. Coast Guard.  The Court dismissed all claims against these Defendants with prejudice.

4.      During the pendency of this lawsuit, Defendants USA and NGSS asserted Third-Party Complaints.  The Government's Third-Party Complaint was filed against M/V AMERICAN CORMORANT, *in rem*, on September 18, 2006 [92-1], and NGSS's Third-Party Complaint was filed against M/V ASIAN ATLAS (ex M/V AMERICAN CORMORANT), *in rem*, on October 11, 2006 [113-1].

5.      A non-jury trial in this matter commenced on February 13, 2008, with opening statements from the parties' counsel, and continued through February 15, 2008.  The trial was recessed until February 21, 2008, and continued through February 22, 2008.  The trial was again recessed until March 31, 2008, and continued through its conclusion on April 4, 2008.

6.      During the trial, the Court admitted into evidence numerous and voluminous exhibits, and heard extensive testimony, both live and by deposition, from a number of fact and expert witnesses.

7.      The Court, having heard all of the testimony and arguments in this case, having considered all of the exhibits, depositions, relevant legal authorities, and proposed findings of fact and conclusions of law submitted by all parties, now by a preponderance of the evidence makes the following Findings of Fact and arrives at the following Conclusions of Law:

## II.  FINDINGS OF FACT

A.    Background

1.    Osprey, at all times material to this case, was a corporation organized and existing under the laws of a state other than the State of Mississippi and was engaged in the business of owning and/or operating the oceangoing heavy lift vessel, M/V AMERICAN CORMORANT, and other vessels.  Cormorant, at all times material to this case, was a corporation organized and existing under the laws of a state other than the State of Mississippi, and was the owner of the M/V AMERICAN CORMORANT.  Subsequent to the events relevant to this case, the vessel was sold to a third party.  *See* Redacted Contract for Sale of Vessel, Ex. J-32.

2.    The M/V AMERICAN CORMORANT was an oceangoing semi-submersible heavy lift vessel that was scheduled to enter the Port of Pascagoula, Mississippi,  on August 15, 2004, and dock at a wharf referred to as the Old Grain Docks.  *See* Vessel's Particulars Sheet, Ex. J-1.

3.    The M/V AMERICAN CORMORANT had an overall length of 225.06 meters, or approximately 738 feet, and a beam, or width, of 41.15 meters, or approximately 135 feet.  *See* Vessel's Particulars Sheet, Ex. J-1; Statement under Oath of Captain John Potter dated August 20, 2004, Ex. DNG-24, at p. 2; Dep. of John Potter, Ex. DNG-38, at p. 17.  At the time of the allision that is the subject of this case, her deepest draft was 10.1 meters, or over 33 feet.  *See* Log August 15, 2004, Ex. J-4; Pascagoula Bar Pilot Ticket, Ex. J-9; Report of Marine Accident, Ex. J-10, at p. 1; Dep. of John Potter, Ex. DNG-38, at pp. 40-42.

4.     In preparation for the vessel's visit to the Port of Pascagoula [the "Port"], representatives of Plaintiffs attended a "load out" meeting in early August 2004 with representatives of various Defendants to this action, including Michael Torjusen, a member of the Pascagoula Bar Pilots.  *See* Load Out Meeting Minutes 08/07/04 - Minutes, Ex. J-3, at p. 2.  At the meeting, it was determined that, due to the M/V AMERICAN CORMORANT's size, length, width, and tonnage, all Port traffic would be stopped during the vessel's arrival and departure.  It was also determined that two pilots and two tugs would be required to berth the vessel.  *See* Load Out Meeting Minutes 08/07/04 - Minutes, Ex. J-3, at p. 2.

5.     While Pascagoula bar pilots are authorized by Port of Pascagoula Tariff Section II, Rule 420 to limit their liability by special contracts or tariffs, none of the compulsory bar pilots who were ultimately aboard the vessel, including Pilot Foster, executed the necessary agreements with Plaintiffs in order to do so with respect to this incident.  *See* Port of Pascagoula Tariff, Ex. J-22, at p. J 00040-41.  An example of the form which would have been required for any such limitation of liability appears at Exhibit P-15.

B.     The Allision, August 15, 2004

6.     The transit occurred during the day in clear weather and with "smooth to slight" seas, unimpaired visibility, and only a light wind.  *See* Marshall Islands Report of Vessel Casualty or Accident, Ex. J-11, at p. 1.

7.     At approximately 0905 hours on August 15, 2004, while the ship was south of the mouth of the Pascagoula River, Pilots Foster and Mosso boarded the

vessel as the assigned compulsory pilots, accompanied by two apprentice pilots, Lundy and Gautier.  Pilots Foster and Mosso assumed primary responsibility for navigating the vessel to the Port.  *See* Log August 15, 2004, Ex. J-4; Pascagoula Bar Pilot Ticket, Ex. J-9; Report of Marine Accident, Ex. J-10, at p. 1; Master's Notices of Protest, Ex. P-19.  Pilots Foster and Mosso took turns conning the vessel as Lead Pilot.

8.      Captain John Potter ["Captain Potter"] was the Master of the M/V AMERICAN CORMORANT.  At all times relevant to the allision, Captain Potter was stationed on the bridge of the vessel, along with the compulsory Pilots Foster and Mosso and the vessel's Third Officer, Galileo Flordeliza.  *See* Statement under Oath of Captain John Potter dated August 20, 2004, Ex. DNG-24, at p. 3.  The vessel's Chief Engineer, D.C. Edwards, was on the starboard wing bridge.  *See id.*

9.      Pilot Mosso initially took the con and piloted the vessel to a point south and east of the mouth of the Pascagoula River.  At that point, Pilot Foster took over as Lead Pilot, and conned the vessel until it ultimately docked.  This included the time of the incident in question.  Pilot Foster testified that he was giving the orders on the vessel at the time of the allision.  At all relevant times, he positioned himself on the center line of the vessel on the bridge, a few feet away from Captain Potter, who was standing to Pilot Foster's right, within earshot.

10.     At approximately 1044 hours, the assist tugboats, NATALIE COLLE and DANIEL COLLE, owned and operated by Defendant Colle Towing, made fast at the forward starboard shoulder near the bow and at the aft starboard quarter of the

vessel, respectively.  *See* Log August 15, 2004, Ex. J-4; Bridge Bell Book, Ex. J-6, at

p. 2; *See* Statement under Oath of Captain John Potter dated August 20, 2004, Ex.

DNG-24, at p. 3.

11.    While maneuvering the M/V AMERICAN CORMORANT up the

Pascagoula River, the bar pilots and the tugboat captains communicated via

handheld VHF radios.  *See* Statement under Oath of Captain John Potter dated

August 20, 2004, Ex. DNG-24, at p. 3.

12.    There was no other large vessel traffic in the Pascagoula River as the

M/V AMERICAN CORMORANT traveled northward up the River.  The Court finds

that the entire 350 foot width of the improved channel was available for the vessel's

use prior to and at the time of the allision.

13.    At around 1100 hours, while maneuvering off the east bank of the

Pascagoula River in the vicinity of Northrop Grumman Shipyard, the M/V

AMERICAN CORMORANT began listing four (4) degrees to starboard.  *See* Log

August 15, 2004, Ex. J-4; Bridge Bell Book, Ex. J-6, at p. 2; Statement under Oath

of Captain John Potter dated August 20, 2004, Ex. DNG-24, at p. 3.  It was later

determined that the vessel had allided with a submerged object, the northwest

corner of a submarine launchway, or Shipway Number 1 [hereinafter, "Launchway

Number 1"], the southernmost of a series of launchways owned by NGSS.  *See*

Report of Construction Solutions, Ex. J-29, at p. 1.

14.    Subsequent investigation revealed the presence of a fifteen (15) foot

scraping of red paint along the front, or western, face of Launchway Number 1.

This red scraping ended at a three (3) foot long area of damaged concrete on the northwest corner of the Launchway.  This damage was caused by the allision of the M/V AMERICAN CORMORANT with Launchway Number 1.[1]  *See* Report of Construction Solutions, Ex. J-29, at pp. 1, 4.  The damage to Launchway Number 1 was located at a water depth of about twenty-one (21) feet, and was about four (4) to seven (7) feet above the bottom of the River.  *See* Report of Construction Solutions, Ex. J-29, at pp. 1, 4.  The record supports the conclusion that the depth of the water at the end of Launchway Number 1 at the time of the allision was between twenty-five (25) and twenty-eight (28) feet.  *See* Initial Incident Report, Ex. P-109, p. USA 490; Report of Construction Solutions, Ex. J-29, at pp. 1, 4.

C.    Launchway Number 1

15.    Launchway Number 1 extends in a southwesterly direction from the shore of the east bank of the Pascagoula River.  Although a large portion of the Launchway is submerged, the landward, or eastern, end of the way is not.  Dan McDonald ["Mr. McDonald"], of T. Baker Smith, Inc., who was designated as an expert witness in the field of surveying by former Defendant Colle Towing, was called by Plaintiffs as an expert at trial.  He testified that the Launchway is a solid concrete slab on its easternmost end, a portion of which is buried underground.  As it gets closer to the water, Launchway Number 1 separates into two individual concrete rails–a northern leg or section, and a southern leg or section–both of which

---

[1]  "[A]n allision occurs when a ship strikes a stationary object while a collision involves two moving vessels or objects."  *Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d 779, 786 n.1 (5th Cir. 2003).

-8-

are partially visible at the shoreline.  The westernmost ends of both legs, however, are submerged under water.  *See* Drawing Number PP2351A of Launchway Number 1, dated July 13, 1959, Ex. P159.

16.    Launchway Number 1 was originally built pursuant to a permit issued by the COE in 1939, and subsequently extended by a series of COE permits, which required that Ingalls, the predecessor of NGSS, mark it as may be required by the U.S. Coast Guard.  *See* Exs. P-92, P-93, P-94, P-95, P-96, P-97.  Launchway Number 1 was one of ten similarly-constructed and situated submarine launchways built by Ingalls in this same vicinity of the River.  In accordance with the relevant permits and instructions from the U.S. Coast Guard, Ingalls, and later NGSS, were required to, and did, maintain two lighted obstruction markers off the outer submerged ends of the Launchways.  The record as a whole, including but not limited to the deposition testimony of U.S. Coast Guard representatives, the U.S. Coast Guard Light List, the NOAA nautical charts of the areas in question, and the testimony of other witnesses at trial, supports the finding that NGSS was required to mark the outer ends of not only Launchway Number 1, but of all of these launchways, with these two markers.  One marker, Red Buoy No. 4, was located at the approximate outer end of the northernmost of all of the launchways, and the other, referred to in this case as Red Buoy No. 2, was located at the approximate outer end of the southernmost of all of the launchways.

17.    According to COE representative Stephen Reid ["Mr. Reid"], the western extent of Launchway Number 1 is approximately 70 feet east of the east

toe, or edge, of the Pascagoula River's improved channel.  *See* COE Sonar Survey

with Recorded Buoy Positions dated Aug. 27, 2004, Ex. "P-325."  Captain Michael

Barrie, Plaintiffs' designated marine surveying expert, testified that the northwest

corner of Launchway Number 1, which was the portion struck by the vessel, was 64

feet east of the edge of the improved channel.

18.    Throughout this litigation, the parties have hotly contested the actual

length of Launchway Number 1.  The Court finds and concludes, by a

preponderance of the credible evidence, that the length of Launchway Number 1,

even if it exceeded the length authorized by COE permits as Plaintiffs insist, was

not, and could not have been, the cause in fact of the allision, for the reasons

discussed more fully hereinafter.  Therefore, the Court need not resolve the

question of the actual length of the Launchway.

D.    NOAA Chart 11375

19.    NOAA nautical Chart 11375 details the area of the Pascagoula River

at issue in this case.  At the time of this incident, the most current version of NOAA

Chart 11375 for the Pascagoula River Channel was dated August 2002.  The copy of

this chart entered into evidence as Exhibit "DNG-8," which is an excerpt from the

chart, reflects that the Upper Pascagoula River Channel is 350 feet wide, including

in the vicinity of Launchway Number 1, has a project depth of 38.0 feet at mean

lower low water (MLLW), has a controlling depth of anywhere from 34.1 feet to 36.0

feet at MLLW, and runs in a substantially south-southwest to north-northeast

direction between the East and West Banks of NGSS's Ingalls Shipyard in the

vicinity of the submerged launchways.

20.    The August 2002 version of Chart 11375 depicts water depths in the vicinity of Red Buoy No. 2 of 26 feet to its south and 6 feet to its north.  *See* Excerpt of NOAA Chart 11375 - 35th Edition, Ex. "DNG-8."

E.    The Vessel's Departure from the Improved Channel.

21.    While navigating the M/V AMERICAN CORMORANT up the Pascagoula River, Pilot Foster intended to favor, and indeed did favor, the eastern side of the improved federal channel as the vessel passed NGSS Shipyard's East Bank.  He testified that he favored the eastern side for two reasons:  (a) because of an inexact report of an obstruction, a dredge pipe, somewhere to the west or on the west side of the channel, of which he learned during the transit upriver with the M/V AMERICAN CORMORANT, and (b) in order to make his approach to the berth.

22.    Pilot Mosso, the other Pascagoula harbor pilot onboard, believed that the reported obstruction was just inside the channel on the west side.  Pilot Michael Lupton, a retired Pascagoula bar pilot whom Pilot Foster called as an expert witness, testified that based on his review of the evidence he believed the obstruction to be located on the edge of the western side of the channel.  Pilot Mosso testified that prior to the date of the allision, there was a temporary green buoy in this area marking the obstruction.  On the day of the allision, the green buoy had been removed, indicating that the obstruction was no longer present.

23.    Pilot Foster intended to remain inside the improved channel during

this portion of the transit, and in fact, testified that there was no reason to take the

M/V AMERICAN CORMORANT outside of the improved channel.  Captain Potter

intended to remain in the center of the improved channel.  He was unaware of the

purported obstruction on the western side of the river.  *See* Dep. of John Potter, Ex.

DNG-38, at pp. 86, 111.  Pilot Mosso also believed that the M/V AMERICAN

CORMORANT should have stayed within the improved channel, and that there was

no reason to depart from the improved channel.  Captain John Betz, who was

retained as an expert pilot for the Government before it was dismissed from the

case and who was called by NGSS as an expert at trial, testified that based on her

draft, the vessel was essentially limited to navigation within the River's 350 foot-

wide improved federal channel.  Pilot Mosso agreed that, based on the water depths

depicted on NOAA Chart 11375, and on the COE sounding or condition survey from

March 2004 for the same area, it was necessary to keep the M/V AMERICAN

CORMORANT well to the west of Red Buoy No. 2.

24.    As for the report of some obstruction to the west, the Court finds that

it would be appropriate to avoid one hazard, so long as by doing so, one did not

present the vessel to another hazard.  As Captain Betz stated at trial, if there was a

hazard to the west, it might be proper to favor the east side of the channel, but not

to leave the channel.  Pilot Foster's expert, Pilot Lupton, testified that even if there

was an obstruction on the western edge of the channel, physically the vessel had

sufficient room on the eastern edge of the channel in which to navigate.  The Court

finds that there was no need or justifiable reason for the vessel to leave the confines

of the 350 foot-wide improved channel.

25.     It is undisputed, and the Court so finds, that Pilot Foster allowed the M/V AMERICAN CORMORANT to leave the improved channel.  According to the testimony of NGSS's expert engineer and surveyor Donald Rowe, the "chine" of the vessel, where the side of the ship meets the bottom of the ship, appeared to strike ground at a point about 257 feet south of the northwestern corner of the northern leg of Launchway Number 1.  Mr. Rowe testified that he reached this conclusion because he found evidence of a disturbance beginning at that point, and continuing along an unbroken path or furrow in the mud outside the channel at a depth of about 25 feet below mean lower low water until the location where the vessel allided with the northwestern corner of the northern leg of Launchway Number 1, which he determined was 76.79 feet outside the improved federal channel.  *See* Report of Donald W. Rowe dated October 27, 2006, at p. 3, Ex. DNG-27.  The furrow extended beyond the northern leg, then made a fairly abrupt swerve to the west. Mr. Rowe concluded that the furrow continued for about 100 feet north of the damaged section of the Launchway, where it turned back toward the channel, at a water depth of about 28 feet.  Based on the totality of the record evidence in this case, the Court is persuaded, and finds, that this furrow described by Mr. Rowe was made by the M/V AMERICAN CORMORANT as it strayed outside the improved channel just prior to the allision.

26.     The record supports the conclusion, and the Court so finds, that after accounting for tides, the water was approximately 25 to 28 feet deep at the time and

in the location where the allision occurred.

27.     The Court credits the testimony of the vessel's Master that the vessel passed Red Buoy No. 2 at a distance of as close as fifteen (15) feet to her starboard side just forward of midships, about halfway between the break of the fo'c'sle (or forecastle) and the midships position, as reported by Captain Potter in his Rule 30(b)(6) designated deposition of Plaintiffs, and in the Marine Accident Report. *See* Dep. of John Potter, Ex. DNG-38, at pp. 60-61, 67-68, 80; Report of Marine Accident, Ex. J-10, at p. 2. The record supports the conclusion that Pilot Foster then maneuvered the vessel to swing the stern away from the buoy by ordering the assist tugs to push. *See* Dep. of John Potter, Ex. DNG-38, at p. 81.

28.     As the after tug DANIEL COLLE approached the buoy, its Captain Green reported to Pilot Foster that he thought he was going to have to let go of his line to avoid hitting the buoy. In response, Pilot Foster told Captain Green to do what he had to do. To avoid contact with the buoy, the DANIEL COLLE shifted from pushing perpendicular to the vessel to laying parallel along the ship's side. *See* Dep. of John Potter, Ex. DNG-38, at pp. 81, 87. The width of the stern tug DANIEL COLLE was about 33 to 36.5 feet. Pilot Mosso, who had a clear view from the starboard side of the bridge at that time, testified that the DANIEL COLLE passed within about two (2) feet of the buoy. The buoy therefore passed within about 35 to 38.5 feet of the M/V AMERICAN CORMORANT at the point where the DANIEL COLLE was alongside the vessel. Whatever the exact distance of the vessel from the buoy may have been, it cannot be disputed, and the Court finds,

that the vessel had to have strayed some 70 feet outside the eastern edge of the improved channel in order to strike the Launchway.

F.    Available Electronic Navigational Equipment

29.    The M/V AMERICAN CORMORANT was equipped with a magnetic compass and gyrocompass, a fathometer or echo sounder, a course recorder, both S Band (10 cm) and X Band (3 cm) Radar, automatic radar plotting aid ["ARPA"] navigation equipment, a differential global positioning system ["GPS"], and radiotelephone communications equipment, all of which was in proper operating condition, but none of which was inquired about or utilized by Pilot Foster on the day in question.  *See* Marshall Islands Report of Vessel Casualty or Accident, Ex. J-11, at p. 1; Report of Captain Stephen F. Ford, Ex. DNG-33, at p. 3; Dep. of John Potter, Ex. DNG-38, at pp. 43-44, 92-93, 109.  The only navigational equipment utilized by anyone aboard the vessel during the portion of the transit immediately prior to the allision was the gyrocompass, which Pilot Foster used for navigation. *See* Dep. of John Potter, Ex. DNG-38, at p. 43.  Captain Potter testified that the echo sounder indicated a depth of water of six (6) feet underneath the keel, which he testified would equate to an overall depth of thirty-four (34) feet of water, at some time before the allision; however, he could not recall how long before the allision he had last checked the echo sounder.  *See* Dep. of John Potter, Ex. DNG-38, at pp. 47-48.  There was some testimony that using such a device, which gave depths under the centerline of the vessel, would be useless because the centerline was still in the channel.  The Court finds credible the testimony of Captain Ford

who opined that, even though the center line of the vessel may not have touched the slope of the channel, the 135 foot-wide vessel's center line at least transited across the boundary of the improved channel, or reached the boundary, in order for the starboard side of the vessel to contact the Launchway at a point some 70 feet outside the improved channel.

G.   The Vessel's Speed

30.   While there was conflicting testimony about the speed at which the vessel was traveling prior to the allision, the Court finds that the speed of the vessel was no greater than 4.5 knots and was not a factor in this incident.

H.   Red Buoy Nos. 2 and 4

31.   Ostensibly marking the "outer end of the submerged ways" were two private aids to navigation, Red Buoy Nos. 2 and 4, owned and maintained by Defendant NGSS.  *See* U.S.C.G. Light List Vol. IV 2004, Ex. J-15, at p. 2.  Plaintiffs insist that NGSS was required by its COE permit to mark the launchways with a cluster piling.  The evidence on this issue, including the COE permit files, is inconclusive, and the Court finds that Plaintiffs have not carried their burden of proving that a cluster piling was required.  While Plaintiffs' expert, Captain Barrie, testified that a cluster piling would have been, in his opinion, a better means of marking the extreme ends of the launchways, the Court is persuaded by the testimony of Randy Joplin of the Jackson County Port Authority.  Mr. Joplin related that there were discussions with port users, including Colle Towing and the harbor pilots, about whether a fixed piling or beacon, as opposed to a buoy, should be used

to mark the launchways.  Mr. Joplin expressed concern that a fixed marker could be knocked down, potentially leaving the end of the launchways unmarked and exposed until a temporary buoy could be placed to mark the obstructions.

32.    The buoy closer in proximity to Launchway Number 1, and which is the subject of this case, was Red Buoy No. 2.  The record is clear, and the Court so finds, that the intended purpose of Red Buoy No. 2 was to serve as an obstruction marker.  Red Buoy No. 2 is depicted on Chart 11375, and described on the Coast Guard Light List, as a flashing red 2.5-second light.  *See* U.S.C.G. Light List Vol. IV 2004, Ex. J-15, at p. 2.  Captain Potter did not recall there being a copy of the U.S. Coast Guard Light List aboard the vessel at the time of its transit into Pascagoula. *See* Dep. of John Potter, Ex. DNG-38, at p. 82.

33.    The record supports the conclusion, and the Court so finds, that it is and was well known to mariners, including both Pilot Foster and Captain Potter, that it is imprudent to rely solely on floating objects such as buoys as navigational aids because these aids are known to move.  Pilot Foster clearly understood that a buoy cannot mark a precise location, only a general area.  Indeed, NOAA Chart 11375 expressly states:

> WARNING
>     The prudent mariner will not rely solely on any single aid to navigation, particularly on floating aids.  See U.S. Coast Guard Light List and U.S. Coast Pilot for details.

Excerpt of NOAA Chart 11375 - 35th Edition, Ex. DNG-8.

34.    A floating buoy, such as Red Buoy No. 2, is highly likely to change

-17-

positions depending on wind, tide, current, and weather conditions. *See* Dep. of
Bryan James Hofferber, Ex. DNG-43, at p. 196. While a buoy will likely remain in
the same general vicinity on a day to day basis, it will not remain in the exact same
location. *See* Dep. of Bryan James Hofferber, Ex. DNG-43, at pp. 196-97. Captain
Betz similarly testified that buoys move, and that the buoy's sinker can also move if
a ship or barge contacts the buoy. As a mariner, Captain Betz's expectation was
that Red Buoy No. 2 would be located roughly near the end of the Launchway.
However, he noted that with respect to private aids such as Red Buoy No. 2, most
mariners do not expect them to remain in precisely one spot or another. Mariners
know that, by their nature, there are limitations on how private aids are monitored
and maintained. Pilot Foster indicated that he was aware that buoys move, and
that the sinker or anchor of a buoy can move as well. Pilot Foster agreed that a
mariner who maneuvers a vessel too close to a buoy runs the risk that the vessel
may hit the buoy itself or the obstruction it marks.

35.     Captain Potter acknowledged his own understanding that a prudent
mariner should not rely on privately maintained navigation aids. *See* Dep. of John
Potter, Ex. DNG-38, at p. 76. Pilot Foster testified that he in fact relied more
heavily on the buoys maintained by NGSS because they were inspected more often
than those maintained by the Coast Guard. The Court finds that Red Buoy No. 2
was a privately maintained aid intended to mark an obstruction. To the extent it
could be considered a potential aid to navigation, it was not reasonable to rely solely
on this marker for navigational purposes because it was a privately maintained

floating object.  The Court finds that Captain Potter and Pilot Foster relied on Red

Buoy No. 2 as essentially the primary means of navigating this vessel in order to

remain within the improved channel in the vicinity of the launchways.  Such

reliance was unreasonable as a matter of both fact and law.

36.     NGSS knew that it had a duty to maintain Buoy Nos. 2 and 4 at

stations off the submerged outer ends of Launchway Numbers 1 (the southernmost

launchway) and 10 (the northernmost launchway), respectively.  On and before

August 15, 2004, mariners and pilots navigating the waters of the Pascagoula River

relied on these buoys to mark the ends of the submerged launchways.

37.     Captain Barrie testified that, based upon the manner in which NGSS

representative Steve Saucier described the method by which its location was

visually monitored, Red Buoy No. 2 would be positioned approximately 60 or 70 feet

to the east of the end of the launchways.  Captain Barrie believed this was

consistent with his opinion that NGSS did not properly maintain or monitor the

position of the buoy since this sighting method would always place it to the east of

the west end of Launchway Number 1.  *See* Drawing of Launchways and Buoy

Locations, Ex. P-52.  Plaintiffs' contention is that Red Buoy No. 2 was supposed to

mark the westernmost extent of Launchway Number 1, which would have been the

northwest corner of the northern leg of the Launchway, the portion which was

struck in the allision.

38.     The Court finds that the most persuasive evidence of the location of

Red Buoy No. 2 derives from inspections made closest in time to the allision.  The

Coast Guard conducted its annual verification of the Buoy on June 2, 2004, roughly six weeks before the allision, and noted that it was "left watching properly." According to Coast Guard representative Bryan James Hofferber, this meant in the "approximate position" of, or in "close vicinity" to, where the Buoy was supposed to be located.  *See* Dep. of Bryan James Hofferber, Ex. DNG-43, at pp. 194-96. Bosarge Diving inspected Red Buoy No. 2 and the damaged northwest corner of Launchway Number 1 on the afternoon of the allision, August 15, 2004.  According to calculations made by Plaintiffs' surveying expert, Dan McDonald, based on Bosarge's findings, the Buoy was 4.8 feet east of the northwest corner of Launchway Number 1 mere hours after the allision.  *See* T. Baker Smith Data Evaluation Report, at pp. 1-2, Ex. P-156; August 16, 2004, Report from Brandon Bosarge, Bosarge Diving, Inc.*,* at pp. 7-8, Ex. P-305.  Based upon Bosarge's findings, NGSS's expert engineer and surveyor Donald Rowe concluded that on the afternoon of the allision, Red Buoy No. 2 was about 17 feet west of the southwest end of Launchway Number 1, and was about even with the northwest end of the way.  The COE hired Construction Solutions to survey the area after the allision.  *See* Report of Construction Solutions, Ex. "J-29."  COE representative Steve Reid testified that on August 16, 2004, Red Buoy No. 2 was roughly 18 feet east and 51 feet south of the westernmost extent of the northern leg of Launchway Number 1.

    39.   Red Buoy No. 2 is listed in the U.S. Coast Guard Light List as a private aid to navigation marking the "outer end" of the submerged launchways. Captain Betz testified that his interpretation of the Light List was that the buoy

roughly marks the outer end, or end farthest away from the shore, but as a mariner, he testified that he knows that buoys move.  Because there were two buoys, Red Buoy Nos. 2 and 4, marking the entire set of ten launchways, not just one buoy marking each individual way, Captain Betz would expect that, as a mariner, the "outer end" would be the farthest end out from the shore, and that the southern buoy (Red Buoy No. 2) would be located at the southwestern extent of all of the ways, while the northern one (Red Buoy No. 4) would be positioned at the northwestern corner of all of the ways.  The Court finds and concludes that a reasonable and prudent mariner should have expected the buoys to be in these general positions.

40.     The Court further finds, by a preponderance of the credible evidence, that Red Buoy No. 2 was sufficiently marking the "outer end of the submerged ways," as contemplated by the Coast Guard Light List.  *See* U.S.C.G. Light List Vol. IV 2004, Ex. J-15, at p. 2.  Moreover, the Court is of the opinion that even if Red Buoy No. 2 was out of position at the time of the allision, as asserted by Plaintiffs, it was not, and could not have been, the cause in fact of the allision because as Captain Barrie, Captain Betz, Captain Ford, and Pilot Lupton all testified, if the vessel had remained within the improved channel, she would never have allided with the Launchway.  The Court finds by a preponderance of the evidence that the cause in fact of the allision was the vessel's failure to remain in the improved channel, where, due to its deep draft, it should have remained at all times.

I.    Water Depths Near Red Buoy No. 2

41.    COE representative Mr. Reid testified that the last COE condition survey of this area published prior to the allision showed that Red Buoy No. 2 was located in approximately 23.8 feet of water relative to mean lower low water.  This was much less than the draft of the M/V AMERICAN CORMORANT, even at high tide.  *See* COE Condition Survey dated March 9, 2004, Ex. P-308.  According to Mr. Reid, COE condition surveys are performed approximately four times a year and are available for public inspection.  For the past few years, the condition surveys have been available on the COE's website.  Before that time, they were available to the public in paper format.  Pilot Mosso testified that he, as a pilot, made a practice of regularly reviewing these surveys, such as the one contained at Exhibit "P-308." Allen Moeller of the Jackson County Port Authority testified that the COE provides the Port with their quarterly condition survey, and that the Port keeps the current surveys on record for use by the Port users, including the harbor pilots.  Randy Joplin testified that at the time of the allision in 2004, the Port Authority would distribute the surveys to the pilots and to other users.  Based on the foregoing as well as on the record as a whole, it is beyond dispute that the water in the vicinity of Launchway Number 1 and Red Buoy No. 2 was entirely too shallow for a vessel with the draft of the M/V AMERICAN CORMORANT, and Pilot Foster should have been aware of this fact.

42.    The record reflects that, at the time of the allision, the following publications were aboard the vessel:  The January 29, 2004, edition of British

Admiralty Chart No. 3841 for the Pascagoula River and Harbor; Admiralty List of Lights (Vol. J 2003/2004); Guide to Port Entry 2003/2004 Edition; Admiralty List of Radio Signals 2003/2004; and East Coasts of Central America and Gulf of Mexico Pilot (3d Ed. 2003). *See* Statement under Oath of Captain John Potter Dated August 20, 2004, Ex. DNG 24, at p. 2; Master's Copy of British Admiralty Chart, Ex. J-2. Pilot Foster testified that the British Admiralty Chart was the chart he relied upon while aboard the M/V AMERICAN CORMORANT. The U.S. Chart 11375 and the British Admiralty Chart No. 3841 were substantially identical. *See* Master's Copy of British Admiralty Chart No. 3841, Ex. J-2; British Admiralty Chart No. 3841, Ex. J-14; 2004 edition of Chart No. 11375, Ex. DF-64.

43.     When Captain Potter expressed some concern regarding the proximity of the M/V AMERICAN CORMORANT to Red Buoy No. 2, Pilot Foster assured him that the vessel had plenty of water. Captain Potter gave no orders concerning navigation of the vessel while it was in the vicinity of Red Buoy No. 2. If Captain Potter had reviewed the British Admiralty Chart aboard his vessel, he would or should have known that the position of Red Buoy No. 2 was charted outside the improved channel, in water reported as 26 feet deep to its south and 6 feet deep to its north, areas that he admitted he would want to avoid in a vessel with the draft of the M/V AMERICAN CORMORANT. *See* Dep. of John Potter, Ex. DNG-38, at p. 103. The chart aboard the vessel also indicated that the buoy was charted as approximately 200 feet outside the improved channel. As both Pilot Mosso and Plaintiffs' own expert, Captain Barrie, testified, if Captain Potter had reviewed and

relied upon the chart, he would have seen that, at least according to the chart, he would have needed to keep the vessel about 200 feet west of the buoy in order to ensure the vessel remained in the channel.  At his deposition, Captain Potter agreed that the charted position of Red Buoy No. 2 on the British Admiralty Chart was 200 feet outside the improved channel.  *See* Dep. of John Potter, Ex. DNG-38, at pp. 84-85.  Pilot Foster similarly testified that on both the U.S. Chart 11375 and the British Admiralty Chart, Red Buoy No. 2 appeared 200 feet outside the channel.

44.    While it is beyond dispute that Red Buoy No. 2 was a privately maintained aid marking obstructions to navigation, specifically the series of submerged launchways, Pilot Foster believed that the buoy was a channel marker, and told Captain Potter so.  *See* Statement under Oath of Captain John Potter dated August 20, 2004, Ex. DNG-24, at p. 5; Dep. of John Potter, Ex. DNG-38, at pp. 17, 26.  Pilot Foster testified at trial that he did not believe the buoy was a channel marker at the time of the allision, but that he thought that it was within a few feet of the edge of the channel.  Captain Barrie testified that the pilots should have known that Red Buoy No. 2 was not a channel marker.  Pilot Foster stated that he made no distinction between privately maintained aids and Coast Guard aids for navigational purposes, despite the fact that he admitted being familiar with the Coast Guard Light List, which clearly indicates that a prudent pilot should not place complete reliance on privately maintained buoys, and that all buoys should be used as guides and not infallible navigational aids.  Pilot Foster normally relied solely on the buoys to ascertain his position while navigating vessels into the

-24-

Pascagoula harbor.  As he acknowledged at trial, "if the buoy is wrong, I'm wrong."
Captain Potter conceded that if an aid to navigation is privately maintained, as a
prudent mariner, he would know that it would not be marking a channel.  *See* Dep.
of John Potter, Ex. DNG-38, at pp. 76-77.  The Court finds that based upon his
unreasonable failure to familiarize himself with the chart and the location and
purpose of Red Buoy No. 2, at the time of the allision Captain Potter was under the
erroneous and unreasonable impression that the vessel was within the limits of the
improved channel and in water with sufficient depth for the vessel.  *See* Dep. of
John Potter, Ex. DNG-38, at p. 99-100.

J.     Factors Contributing to the Allision

45.     Inland Navigational Rule 5, 33 U.S.C. § 2005, which is commonly
known as Inland Rule of the Road 5, states that "[e]very vessel shall at all times
maintain a proper look-out by sight and hearing as well as by all available means
appropriate in the prevailing circumstances and conditions so as to make a full
appraisal of the situation and of the risk of collision."  The Court finds that, by a
preponderance of the credible evidence, there was no proper lookout posted by the
vessel's Master under the prevailing circumstances and conditions at the time of the
allision.  *See* Dep. of John Potter, Ex. DNG-38, at p. 78.  The Court finds that the
absence of a proper lookout caused or contributed to the allision.  While Pilot Foster
testified that he saw Red Buoy No. 2 and was satisfied with the distance the vessel
maintained from the Buoy, the Court finds that the absence of a lookout was
nevertheless a contributing cause in fact of the allision.  The Court finds that a

proper lookout would have been beneficial to Captain Potter to monitor the vessel's movement and assist with positional awareness before the vessel strayed as close as 15 feet to the buoy.

46.    The Court finds that the vessel did in fact leave the improved channel and venture into water too shallow to accommodate its draft prior to the allision. The Court is of the opinion that, based on a preponderance of the credible evidence, the M/V AMERICAN CORMORANT's departure from the improved channel was the cause in fact of the allision.  As Captain Barrie, Captain Betz, and Pilot Lupton all testified, if the vessel had remained in the channel, she would never have allided with the Launchway.

47.    The Court credits the testimony of Captain Betz regarding Bridge Resource Management ["BRM"], which is a process that standardizes the behavior of bridge personnel as they pilot or con ships from one dock to another.

48.    The first component of BRM is a passage planning stage.  In this stage, the objective is to identify the areas where the ship can and cannot travel safely, which is typically determined based on the vessel's draft.  Captain Betz explained that one would inspect the chart and mark the areas where the ship cannot transit, which are known as "no-go" areas, meaning that the ship cannot physically navigate there.  The next step is to place a track line on the chart showing the course the vessel will follow to the planned destination through areas that the ship can traverse.  According to Captain Betz, the chart is the primary resource for preparation of the passage plan, but a prudent mariner should also review the

Coast Guard Light List, the Coast Pilot, and various other resources. NGSS's

expert Captain Stephen Ford likewise testified that the harbor passage plan would

have consisted of the following items drawn on the chart: course headings, intended

distances off objects, waypoints, danger bearings, and "no go" areas. This

information would have been available for the pilot's reference when he came

aboard. Pilot Foster's expert, Michael Lupton, a Pascagoula bar pilot for 15 years,

testified that as a pilot on several Chevron oil refinery vessels entering nearby

Bayou Casotte, he observed that these vessels all had their charts marked with "no

go" areas, tugboat areas, and turnpoints from the sea buoy to the berth.

 49. The second component of BRM is execution. After a pilot takes over

the con of the vessel, the bridge team, including the master of the vessel, will double

check the actions of the pilot as the vessel proceeds into port.

 50. The third component of BRM is monitoring, wherein someone must

constantly monitor the vessel for cross track error, or the degree to which the vessel

deviates from its course, whether due to set or slide or misjudgment. Captain Betz

testified that the standard throughout the industry is that the master of a vessel

and his team are charged with monitoring the progress of their vessel, whether or

not a pilot is directing its movements.

 51. The Court finds that the Master and crew of the M/V AMERICAN

CORMORANT did not employ proper BRM. The fact that Captain Potter was

under the erroneous impression that Red Buoy No. 2 marked the limits of the

improved channel clearly demonstrates that he was not very well prepared for this

transit.  The Court finds that there was little to no evidence of any passage planning conducted by the Master or crew of the vessel.  The record evidence, including that reflected on the chart from the vessel, which reveals few, if any, of the sort of notations that indicate any degree of passage planning, supports this conclusion.  The Court finds that passage planning typically should occur before a vessel picks up a pilot, and the pilot should also have a passage plan in mind when he boards the vessel.  The evidence indicates that although there was some minimal discussion in the master-pilot exchange, there was an overall lack of sufficient communication between Captain Potter and Pilot Foster regarding their respective passage plans, to the extent either gave any thought to this subject.  Captain Potter intended to stay in the center of the channel, and he was unaware of the obstruction on the western side of the River, which was Pilot Foster's purported justification for favoring the eastern side of the improved channel.  *See* Dep. of John Potter, Ex. DNG-38, at pp. 86, 111.

52.    The Court agrees with the conclusion of Plaintiffs' own expert, Captain Barrie, who testified that while the M/V AMERICAN CORMORANT prepared some passage plan, it did not plan the portion of the voyage coming up through the Pascagoula River, particularly for the area where the incident occurred.  Captain Barrie concurred that it would have been prudent for the vessel to have a passage plan encompassing the transit all the way to the location of the intended berth.  The Court finds that this was not sufficiently done.  NGSS's expert Captain Ford testified that preparation of a passage plan is the responsibility of the master of the

vessel, and that this should be done well before the ship enters the Pascagoula River channel.  The Court agrees and finds, based on the record, little to no such evidence of a passage plan for entering the channel.  Captain Barrie acknowledged that the failure to have a passage plan to this location was a mistake on the part of the vessel.

53.     There is no credible evidence that either the Master or crew prepared a pre-plotted course for the vessel to follow, particularly within the vicinity of Red Buoy No. 2, or that they adequately compared what minimal plans they did have prior to the transit.  As the evidence in this case shows, the area in the immediate vicinity of Red Buoy No. 2 was obviously a "no-go" area for a vessel of the size and draft of the M/V AMERICAN CORMORANT–both near the buoy's actual as well as near its charted location.  The Court finds that both Master and crew of the vessel, as well as Pilot Foster, took almost no measures at all, but certainly not reasonable and prudent ones, to inform themselves that this was a "no-go" area or to avoid the area of Red Buoy No. 2 and Launchway Number 1.  Similarly, the Court finds that the Master and Pilot Foster took wholly insufficient steps to ensure that the vessel remained within the improved channel, and that these foregoing lapses were the cause in fact of the allision.

54.     The Court finds that the Master and crew of the M/V AMERICAN CORMORANT were not properly monitoring the actions of Pilot Foster during the transit.  While Captain Potter engaged in some monitoring, it was wholly insufficient and unreasonable under the circumstances.  Captain Barrie agreed that

Captain Potter relied too much on Pilot Foster.  The Court finds that as a result, the vessel left the channel.  Captain Barrie further testified that, as a general rule, it is his experience that the master of the vessel remains in control, despite the compulsory pilot giving orders.  Pilot Foster's expert Michael Lupton similarly stated that when a pilot goes aboard the vessel, it is strictly as an advisor to the master, and the master remains in control.  The Court finds by a preponderance of the credible evidence that the Master's monitoring of the M/V AMERICAN CORMORANT during its transit was insufficient.  It is clear that as a vessel enters a port, the tolerances for error grow smaller, making it more critical that a master and crew monitor events closely.  The Court finds that these lapses were all the more unreasonable since the record indicates that there were a number of resources available to alert the Master, crew, and Pilot Foster that the M/V AMERICAN CORMORANT was leaving the improved channel.  For the most part, these were not employed.

55.   The Court also finds that the crew of the M/V AMERICAN CORMORANT did not properly fix the vessel's position during the transit.  Captain Betz testified that when a vessel enters a narrow channel like the one in this case, the crew is still required to fix the vessel's position, which means, among other things, taking visual ranges or bearings and using electronics, such as the GPS aboard the M/V AMERICAN CORMORANT.  Captain Ford testified that a proper fix is when two lines of position cross, at a minimum.  He stated that one on the vessel could have added, and should have added, additional information, if

appropriate, such as the depth observed at the same time the fix was made, or other navigational cross checks. The Court agrees.

56.     The Court finds that, armed with such additional information, those onboard the ship would have known that it was departing the improved federal channel early enough for the Master to have intervened. The record supports the finding that the crew could and should have employed multiple methods to avoid an error such as this one, including taking visual bearings and radar ranges, and utilizing available electronics such as GPS for positions, not to mention plotting the vessel's position. *See* 33 C.F.R. § 164.11. The Court finds that almost none of these things were done by the Master and crew. The record indicates that what the crew did was place marks on the chart as the vessel passed different buoys and beacons. This was insufficient under the facts of this case.

57.     The local harbor pilots testified that there was no way to determine the position of a vessel in the vicinity of Red Buoy No. 2, and Captain Barrie testified that he concurred with their experience in this particular area. The Court disagrees. Based on a review of the chart as well as the other credible record evidence, the Court finds that there were landmarks and natural ranges of convenience in the Pascagoula Harbor environment which could and should have been utilized to fix the vessel's position, and which, if used while navigating the River in the vicinity of the launchways, would have allowed the M/V AMERICAN CORMORANT to fix its position and navigate safely. *See, e.g.,* Report of Captain John M. Betz dated October 31, 2006, Ex. DNG-29, at p. 7; Report of Captain

Stephen F. Ford, Ex. DNG-33, at p. 65.  Captain Ford personally observed these visual ranges while traversing the river in a small boat and testified that the crew could have used them to keep the ship inside the channel.  *See* Report of Captain Stephen F. Ford, Ex. DNG-33, at p. 65.  Tug Captain Green also testified that there were landmarks in this area from which one could take visual fixes, including the elevated dock face and the clusters to which ships are tied.  In fact, Pilot Foster's expert, Michael Lupton, acknowledged that he had been aboard United States Navy vessels entering the Port of Pascagoula, and had personally observed that crews were able to, and did, take visual bearings of objects such as those discussed above to fix their positions.

58.     Captain Barrie acknowledged that at the time the vessel was proceeding up the Pascagoula River toward Red Buoy No. 2, there had been a time lapse in anyone fixing the vessel's position, and at that point in time, the vessel was no longer complying with (1) 33 C.F.R. § 164.11(a)(2), which requires that the wheelhouse be constantly manned by persons who fix the vessel's position; (2) 33 C.F.R. § 164.11(c), which requires that the position of the vessel at each fix be plotted on a chart of the area and the person directing the movement of the vessel be informed of the vessel's position; and (3) 33 C.F.R. § 164.11(d), which requires that electronic and other navigational equipment, external fixed aids to navigation, geographic reference points, and hydrographic contours be used when fixing the vessel's position.  The Court finds that, because there was only approximately 1 foot of under-keel clearance between the maximum draft of the ship and the controlling

depth of the improved channel, the need to fix the position of the ship as it came up the River was extremely critical.  Captain Potter did not comply with the reasonable standard of care and prudence that is expected of a master bringing a vessel the size and draft of the M/V AMERICAN CORMORANT into Pascagoula.

59.   The M/V AMERICAN CORMORANT left the channel and allided with the Launchway due also to (1) Pilot Foster's unreasonable reliance on Red Buoy No. 2 as a channel marker to determine the position of the M/V AMERICAN CORMORANT; (2) Pilot Foster's allowing the deep-draft vessel to get too close to Red Buoy No. 2; (3) Captain Potter's failure to perform or ensure the performance of proper pre-planning of a track or passage plan for the vessel; (4) Captain Potter's failure to fix and plot the vessel's position along the track; and (5) Captain Potter's placing too much reliance upon the knowledge and skill of Pilot Foster.  The Court finds that it was not necessary to rely on Red Buoy No. 2 to keep the vessel within the improved channel because there were sufficient fixed objects ashore to ascertain the vessel's position, and because the vessel had sufficient equipment on board to safely navigate through the area without relying on the buoy.  The Court finds that it was unreasonable to rely solely on a floating buoy to ensure that a vessel of this size and draft remained within the improved channel.

60.   Indeed, when Plaintiffs' own expert Captain Barrie was asked if it was his opinion that the Master and crew of the M/V AMERICAN CORMORANT were free of any fault in causing this allision, he stated that "[t]here would have been some fault for relying too much on the pilot and for being outside of the federally

maintained channel." Transcript of *Daubert* Hearing, January 31, 2008, and February 1, 2008, Ex. P-333, at pp. 152-53. The Court finds this testimony credible. Captain Barrie further opined that Captain Potter "improperly relied" on the pilot's advice in this case. *See* Transcript of *Daubert* Hearing, January 31, 2008, and February 1, 2008, Ex. P-333, at p. 153. Captain Barrie also testified at trial that it was improper for Captain Potter to let the ship get within 15 feet of Red Buoy No. 2. The Court agrees and finds that Captain Potter relied too heavily on Pilot Foster. The Court further finds that Captain Potter failed to sufficiently familiarize himself or his crew with the River in order to be able to recognize hazards or dangers to the vessel or to countermand Pilot Foster when it became necessary.

61.    The only time that Captain Potter expressed any concern regarding the proximity of the M/V AMERICAN CORMORANT to Red Buoy No. 2 was at a point when the bow had passed the buoy, and the buoy was approximately a quarter of the way down the length of the cargo deck. *See* Dep. of John Potter, Ex. DNG-38, at p. 18. Captain Potter should have known that the vessel was too close to the buoy at that point, and even sooner, rather than asking whether it was. By his own admission, Captain Potter observed the buoy to be approximately fifteen (15) feet off the starboard side of the vessel. *See* Dep. of John Potter, Ex. DNG-38, at pp. 18, 28. Captain Potter did not take over the con of the vessel or further question Pilot Foster, but simply and unreasonably relied on Pilot Foster's assurances.

62.    The Court finds that Captain Potter also did not meet the standard of care and reasonable prudence expected of a master in this situation because he did

not adequately plan for or monitor the vessel's progress.  Based on the preponderance of the credible evidence, the Court is of the opinion that, had Captain Potter and other members of the M/V AMERICAN CORMORANT bridge team utilized proper planning and monitoring techniques, the vessel would have remained in safe waters inside the improved federal channel and would not have allided with Launchway Number 1.  Without monitoring or being prepared to monitor the Pilot's actions or the vessel's progress as it proceeded up the River, Captain Potter made it impossible for him to intervene or take action should the vessel encounter danger.  The Court finds that this was a cause of the allision.

63.     In sum, the Court finds that Plaintiffs have not carried their burden of proof or demonstrated that Red Buoy No. 2 was out of position at the time of the allision, or that NGSS committed any act or omission sufficient to render it liable in this case.  It was unreasonable for either Captain Potter or Pilot Foster to permit the M/V AMERICAN CORMORANT to stray from the improved channel at any point during the transit, but particularly in the vicinity of Red Buoy No. 2 and the submerged launchways.  The Court finds that the aforementioned conduct of both Pilot Foster and Captain Potter was the cause in fact of this incident.

K.     Repairs to the Vessel

64.     After the allision, the vessel proceeded north and berthed at the Old Grain Docks, as intended.  While at the dock, the vessel was inspected.  *See* Report of Marine Accident, Ex. J-10, at p. 2.

65.     Damage to the vessel from its contact with the submerged Launchway

included an 82-foot gash in the vessel's hull below the water line.  *See* Report of

Marine Accident, Ex. J-10, at p. 2; Master's Notices of Protest, Ex. P-19.

66.    Mr. Erik Fiske ["Mr. Fiske"], the risk manager for Osprey Ship

Management at the time of the allision, testified at trial regarding Plaintiffs'

alleged damages.  Bosarge Diving initially inspected the vessel at the Port of

Pascagoula, charging $7,212.50 for its services.  After deducting some charges

which did not pertain to examining the damages, the diving expenses attributable

to the allision were $4,337.50.  *See* Spreadsheet, at p. 2, Ex. P-183; Invoice of

Bosarge Diving, Ex. P-330.  Mr. Fiske later testified that $1,250.00 of this amount

should be subtracted because it was not related to the repair of the vessel, but to

the survey of the area at the site of the allision.  Therefore, Plaintiffs are claiming

total diving expenses of $3,087.50 associated with Bosarge Diving's services.

Because the M/V AMERICAN CORMORANT was a Marshall Islands flagged

vessel, the Trust Company of the Marshall Islands, Inc., was required to inspect the

vessel after the allision.  Plaintiffs incurred expenses of $697.48 related to this

inspection.  *See* Spreadsheet, at p. 2, Ex. P-183; Invoice from the Trust Company of

the Marshall Islands, Inc., Ex. P-331.

67.    After obtaining approval from the U.S. Coast Guard to depart the Port

of Pascagoula, the M/V AMERICAN CORMORANT proceeded to drydock at the

Atlantic Marine, Inc., shipyard in Mobile, Alabama, in order to ascertain the full

extent of damages.  *See* W. T. Ames Damage Survey, August 24, 2004, Ex. P-207, at

p. 1; Letter from Coast Guard, August 16, 2004, at p. 1, Ex. P-231.  After a joint

survey conducted at Atlantic Marine, BMT Salvage Limited issued a Field Survey Report of the damages. *See* Field Survey Report, Ex. P-206. Mr. Fiske testified that no temporary patches were required on the vessel at Mobile in order to obtain the Coast Guard's permission to transit to Tampa, Florida. However, some work was performed in Mobile, such as cutting away and smoothing some of the shell plating hanging from the side of the ship.

68.    Expenses incurred by Plaintiffs while at Atlantic Marine totaled $117,835.00. *See* Spreadsheet, at p. 2, Ex. P-183. Plaintiffs also incurred owners' attendance expenses at both Pascagoula and Mobile which totaled $3,647.20. *See* Spreadsheet, at p. 2, Ex. P-183 (owners' attendance expense charges of $1,345.51, $499.89, $100.00, $918.86, $462.18, and $320.76).

69.    Plaintiffs claim expenses from retaining ProMar Agency to attend to owner's needs during the time the vessel remained in Pascagoula after the allision, and then while at Mobile. Mr. Fiske testified that most of the ProMar Agency charges would not have been incurred by Plaintiffs, but for the incident. Plaintiffs allocate $12,788.30, out of the $52,535.42, charged by ProMar while at Pascagoula, to the allision. *See* Invoices from ProMar Agency, Ex. P-219; Spreadsheet, at p. 3, Ex. P-183. Plaintiffs allocate $24,030.30 to the allision out of the $59,802.91 ProMar charged for departure from Pascagoula. *See* Invoices from ProMar Agency, Ex. P-218; Spreadsheet, at p. 3, Ex. P-183. Finally, Plaintiffs allocate $54,716.11 to the allision out of the $56,065.54 charged by ProMar while at Mobile. *See* Invoices from ProMar Agency, Ex. P-217; Spreadsheet, at p. 3, Ex. P-183. The total of these

ProMar charges which Plaintiffs seek to recover is $91,534.71.

70.    The damages reported in the Field Survey Report were then put out for bid.  After the various bids were considered, and after receiving Coast Guard approval, the vessel proceeded to Tampa Bay Shipbuilding & Repair Company in Tampa Bay, Florida, where those repairs deemed necessary, as well as other unrelated owner's work, were performed.  *See* Coast Guard Letter, August 20, 2004, at p. 1, Ex. P-232.  The vessel entered drydock at Tampa Bay on August 25, 2004. *See* Nigel Groves Repair Log/ Tampa, FL (0219-226), at p. 0219, Ex. P-212.  The vessel departed Tampa on September 8, 2005.  *See* Nigel Groves Repair Log/ Tampa, FL (0219-226), at p. 0226, Ex. P-212.

71.    All repairs to the M/V AMERICAN CORMORANT at Tampa Bay Shipbuilding totaled $903,370.00.  *See* Tampa Bay Invoice, Ex. P-215.  Mr. Fiske testified that after allocation of expenses between repairs related to the allision and those made at the request of Plaintiffs which were unrelated to the incident, the total charge for repairs performed at Tampa which were associated with the allision was $707,370.00.  *See* Spreadsheet, at p. 2, Ex. P-183.  Tug assist from Seabulk Towing for docking at Tampa cost Plaintiffs $7,532.56.  *See* Spreadsheet, at p. 2, Ex. P-183; Invoices from Seabulk Towing, P-236.  Plaintiffs incurred pilotage fees for the vessel's arrival at Tampa of $3,457.01, pilotage fees for the vessel's departure from Tampa of $3,857.19, a Harbormaster fee at Tampa of $295.20, and an agent's fee of $2,000.00.  *See* Invoices from ISS-RIOMAR, at pp. 0237, 0238, Ex. P-235*;* ISS-RIOMAR Disbursement Account Invoice, Ex. P-332; Spreadsheet, at p. 3, Ex. P-183.

Mr. Fiske testified that Plaintiffs incurred a charge of $480.50 for APHIS user fees and a charge of $397.00 for U.S. Coast Guard user fees as a foreign-flagged ship when it entered Tampa, for a total of $877.50.  *See* Invoices from ISS-RIOMAR, at pp. 0233, 0236, Ex. P-235; Spreadsheet, at p. 3, Ex. P-183.  At trial counsel for NGSS inquired of Mr. Fiske whether these charges should be apportioned based on the fact that some of the work performed at Tampa was admittedly unrelated to the allision.  The Court finds that these charges would have been incurred even if no unrelated work had been performed, and are therefore properly considered damages related to the allision.

72.    Plaintiffs also claim expenses for required damage surveys by Det Norske Veritas ["DNV"] at Mobile for $8,404.14, and at Tampa for $9,255.11, which Mr. Fiske testified was after apportionment for unrelated work.  *See* DNV Survey Expenses, Ex. P-223; Spreadsheet, at p. 2, Ex. P-183.  In order for Plaintiffs to move the vessel from Mobile to Tampa for repairs, Plaintiffs incurred a charge of $280.80 from DNV for a "Port State Control Follow-Up Survey" conducted in Mobile.  *See* Additional DNV Survey Expenses, Ex. P-229; Spreadsheet, at p. 2, Ex. P-183. Plaintiffs also incurred a $301.00 fee for a statement of class from DNV.  *See* Vessel Class certificates, at p. 0034, Ex. P-319; Spreadsheet, at p. 4, Ex. P-183.

73.    Plaintiffs incurred charges for paint needed to recoat the hull and perform other necessary coating associated with disturbances resulting from the repairs that were made due to the allision.  CMP Coatings, Inc., charged $756.69, $900.57, and $1,450.00, respectively, for these services, for a total charge of

-39-

$3,107.36.  *See* CMP Coatings Expenses, Ex. P-224; Spreadsheet, at p. 2, Ex. P-183.

74.     Plaintiffs seek recovery of charges from Nigel Groves with Noble
Denton for his work relative to assisting in arranging for the M/V AMERICAN
CORMORANT's transit from Pascagoula to Mobile, then onward to Tampa, and
later for his attending the ship as superintendent for repairs.  *See* Noble Denton
Invoices, Ex. P-212.  Plaintiffs paid Noble Denton invoices of $17,647.66 and
$38,058.56 in fees (converted from British pounds by Mr. Fiske during his
testimony).  *See* Noble Denton Invoices, Ex. P-212; Spreadsheet, at p. 2, Ex. P-183.
However, Mr. Fiske testified that some of these charges were incurred after the
ship tendered its notice of readiness on September 10, 2004.  The charges incurred
after the notice of readiness totaled $16,718.84 of the $38,058.56, leaving
$21,339.72.  *See* Noble Denton Invoices, Ex. P-212; Spreadsheet, at p. 2, Ex. P-183.
Thus, the charges from Noble Denton for Mr. Groves' services, up until the time the
ship tendered its notice of readiness, were $17,647.66 and $21,339.72, which total
$38,987.38.

75.     Based on the foregoing, Plaintiffs' total claimed costs attributable to
the allision come to $1,019,420.46.  *See* Spreadsheet, at p. 1, Ex. P-183.  Captain
Barrie testified that he was of the opinion that the cost of repairs and the related
expenses identified by Mr. Fiske were reasonable and covered repairs for the
damages attributable to the allision only.  After a thorough review of the record, the
Court agrees, and finds that this figure is an accurate representation of the actual
expenses incurred by Plaintiffs as a result of the allision.

L.  Loss of Hire Damages

76.  Mr. Fiske testified that the M/V AMERICAN CORMORANT's services were generally bid out on a voyage charter basis, with payment of a lump sum regardless of the actual length of the voyage.  In order to determine a time charter equivalent rate, or an effective daily rate, for calendar year 2004, he would take the lump sum voyage charter for each voyage during the period of time covered by Exhibit P-237, deduct certain variable costs or expenses, and then divide by the number of days that were involved in that voyage to arrive at the average daily revenue, which represents the time charter equivalent.  *See* Cormorant Voyage BVA Report, Ex. P-237.  Mr. Fiske testified that the M/V AMERICAN CORMORANT had no "down time," or days waiting for cargo, in 2004.

77.  Mr. Fiske stated that the time charter equivalents for the voyage immediately preceding the allision, the voyage during which the allision occurred, and the voyage immediately following the allision were depicted as Voyages 5, 6, and 7, on the Cormorant Voyage BVA Report.  *See* Cormorant Voyage BVA Report, Ex. P-237.  The voyage time charter equivalents for Voyages 5, 6, and 7 came to $9,914.68, $28,695.32, and $29,963.41, respectively.  *See* Cormorant Voyage BVA Report, Ex. P-237.  By taking the net revenues after operating expenses for these three voyages, and then dividing by the total voyage days of these three voyages, Mr. Fiske asserted that the average daily rate for the three voyages came to $19,486.80.

78.  Mr. Fiske testified that if one ignored the voyages in calendar year

2004 which earned the greatest and the least net time charter equivalent, and picked three voyages out of the remaining four that would give a conservative picture of the net time charter equivalent, the three reflecting the midrange would be voyages 3, 4, and 6. *See* Cormorant Voyage BVA Report, Ex. P-237.  Mr. Fiske calculated the average time charter equivalent for these three voyages as approximately $25,756.34.  Mr. Fiske calculated the average net time charter equivalent for all of the voyages in 2004 to be approximately $19,985.00. *See* Cormorant Voyage BVA Report, Ex. P-237.  Mr. Fiske testified that the vessel was employed for 320 days out of 365 in 2004, representing 88.5 percent of the year.

79.     Mr. Fiske calculated the number of days during which the M/V AMERICAN CORMORANT was unavailable for hire between the date of the incident and the completion of repairs as 25.9 days. *See* Port Log at Pascagoula, MS, Ex. P-227; Port Log at Mobile, AL, Ex. P-228; Port Log 8/17/04 to 8/22/04, Ex. P-243; Log Entrees from 8/15/04 through Return to Pascagoula, MS, 9/10/04, Ex. P-307.  The vessel issued its notice of readiness on September 27, 2004.  However, the voyage during which the allision occurred and the subsequent voyage on a military charter were both completed without any type of financial penalty to Plaintiffs.

80.     According to Mr. Fiske, any owner's work performed on the vessel ran concurrently with work performed due to the allision, such that there was no delay in issuance of the notice of readiness due to owner's work.  Captain Chris Nette, who oversaw the repairs for Plaintiffs in Tampa, testified that the extra lay days in Tampa were properly allocated entirely to the allision-related damage repairs.

According to Captain Nette, the allision-related repairs to the hull and the owner's repairs were carried out at the same time, but did not impact one another since they were in separate areas of the vessel. Mr. Fiske testified that there was some owner's work which required three to four extra days to complete, but because there was also allision-related repair work, specifically side shell plate growth work, requiring the same number of extra days, this extra work ran concurrently with owner's work, such that the owner's work did not increase the amount of days in drydock. *See* File regarding 1 SW Damage, at p. 0135, Ex. P-261; File regarding Bulkhead Repair, at pp. 0147-48, Ex. P-262; File regarding Tank Floor 2 DT, at p. 0150, Ex. P-263; File regarding Bulkhead Repair, at p. 0153, Ex. P-264; File regarding No. 1 STBD Wing Shell Plating, at pp. 0158-59, Ex. P-265; File regarding Bottom Plating No. 2 Port, at p. 0164, Ex. P-266; File regarding Bottom Plating No. 2 STBD DT, at p. 0168, Ex. P-267; Pump Repair, at p. 0172, Ex. P-268; File regarding No. 1 Ballast Line, at p. 0176, Ex. P-269. Captain Nette testified that the owner's work in Tampa was completed on September 4, 2008, and the allision-related repair work in Tampa was completed on September 5, 2008. *See* Tampa Bay Production Schedule, Ex. P-247.

81.    In sum, Mr. Fiske asserted that, due to the allision, there were about 43 days less available for hiring out the M/V AMERICAN CORMORANT to carry cargo.

82.    Based on a careful review of the record evidence, the Court finds and concludes that insufficient evidence was presented to persuade the Court that

Plaintiffs did, or even would have tried, to hire the M/V AMERICAN CORMORANT

for the period of time after its last scheduled voyage, but before its class certificates

expired.  Mr. Fiske testified that even prior to the allision, Plaintiffs had already

decided to sell or scrap the vessel rather than renew her class certificates.  To the

extent Plaintiffs seek recovery for any damages associated with the purported lost

opportunity to hire out the vessel for this period of time, such request is not

supported by the record and will be denied.

### III.  CONCLUSIONS OF LAW

A.    Jurisdiction

1.    This Court has jurisdiction of the parties and of the subject matter,

which is within the admiralty and maritime jurisdiction of the United States and of

this Court.  *See* 28 U.S.C. § 1333.

B.    *The Pennsylvania* Rule

2.    *The Pennsylvania* Rule is "a presumption in admiralty law that a

statutory violation by a party to a collision is a cause of the damage unless it is

established that the violation could not have caused or contributed to the collision."

*American River Transp. Co. v. Kavo Kaliakra SS*, 148 F.3d 446, 449 (5th Cir. 1998)

(*citing The Pennsylvania*, 86 U.S. 125 (1873)).  This presumption is rebuttable.  *See*

*Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 966 (5th Cir. 2001).

Under *The Pennsylvania* Rule, if a vessel is involved in a collision as a result of a

violation of a statute intended to prevent collisions, then the burden shifts to the

"vessel in derogation of a statutory rule" to show that this violation could not have

been a cause of the accident.  *See In re Mid-South Towing Co.*, 418 F.3d 526, 534

(5th Cir. 2005).  This Rule has been expanded beyond collision cases to apply to any

"statutory violator who is a party to a maritime accident."  *Pennzoil Producing Co.*

*v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (internal quotation

omitted); *see also United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116 (5th

Cir. 1985).  The Rule may apply in collision cases as well as in those arising from an

allision.  *See Trico Marine Assets, Inc. v. Diamond B Marine Services, Inc.*, 332 F.3d

779, 786 (5th Cir. 2003) (*citing Acacia Vera Navigation Co. v. Kezia, Ltd.,* 78 F.3d

211, 216 (5th Cir. 1996)).

　　　　3.　　　Plaintiffs and Pilot Foster contend that NGSS violated the Rivers and

Harbors Act, 33 U.S.C. § 403, by creating an obstruction to navigation that was not

properly marked.  Plaintiffs and Pilot Foster argue that Launchway Number 1 was

beyond the length permitted by the COE, thereby creating a purported obstruction

to navigation, and that Red Buoy No. 2 did not sufficiently mark the purported

obstruction.

　　　　4.　　　In order for *The Pennsylvania* Rule to apply, however, the causal

connection between the statutory violation and the resulting injury must not be

implausible.  *See In re Mid-South Towing Co.*, 418 F.3d at 534.  The statutory "fault

which produces liability must be a contributory and proximate cause of the collision,

and not merely fault in the abstract."  *Id.* (*quoting Board of Commissioners of the*

*Port of New Orleans v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir. 1978)); *see*

*Stolt Achievement, Ltd. v. DREDGE B.E. LINDHOLM,* 447 F.3d 360, 364 (5th Cir.

2006); *American River Transp. Co.*, 148 F.3d at 450; *see also In re Denet Towing Services, Inc.*, 178 Fed. App'x 427, 429 (5th Cir. 2006) (finding that although the defendant had committed regulatory violations, the violations were unrelated to the cause of the accident). "To give rise to liability, a culpable act or omission must have been 'a substantial and material factor in causing the collision.'" *American River Transp. Co.*, 148 F.3d at 450 (*quoting Inter-Cities Navig. Corp. v. United States*, 608 F.2d 1079, 1081 (5th Cir. 1979)).

5.      The Fifth Circuit has cautioned that "the Pennsylvania Rule is a rule regarding the burden of proof, not a rule of ultimate liability." *American River Transp. Co.*, 148 F.3d at 450 (*citing Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991)).  Therefore, even

> [i]f a party fails to carry the burden imposed on it by the rule, the rule does not require that party to bear 100% of the responsibility for the allision.  Liability still must be apportioned according to the comparative fault of the parties . . . .

*Pennzoil*, 943 F.2d at 1472.

6.      "Whether the rule is applied against one or both parties to a collision or allision, both may be liable if their negligence proximately caused the accident, and damages are to be assessed in accordance with the principles of comparative negligence." *Sheridan Transp. Co. v. United States*, 834 F.2d 467, 478 (*citing United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975); *Otto Candies, Inc. v. M/V MADELINE D,* 721 F.2d 1034, 1036 (5th Cir. 1983); *Allied Chemical Corp. v. Hess Tankship Co.*, 661 F.2d 1044, 1057-59 (5th Cir. 1981); *Alamo Chemical*

*Transportation Co. v. M/V OVERSEAS VALDES*, 398 F. Supp. 1094, 1104-07 (E.D. La. 1975)).

7.     As stated earlier herein, the Court has found by a preponderance of the credible evidence that the length of Launchway Number 1, even if it exceeded the length authorized by COE permits, was not and could not have been the cause in fact of the allision.  Similarly, the Court has found by a preponderance of the credible evidence that Plaintiffs have not carried their burden of showing that Red Buoy No. 2 was out of position.  Even if it was, this was not and could not have been the cause in fact of the allision.  The Court is of the opinion that the causal connection between the alleged statutory violations by NGSS regarding the Launchway length and buoy position and the allision, even if one existed, is implausible.  *See In re Mid-South Towing Co.*, 418 F.3d at 534.  The Court is of the opinion that the allision was due to the negligence of those aboard the M/V AMERICAN CORMORANT, namely Pilot Foster and Captain Potter and his crew. Therefore, even assuming that NGSS violated a statute intended to prevent collisions, these purported violations could not have been the cause of the allision, and *The Pennsylvania* Rule does not apply.

8.     The Court concludes that Captain Potter and the crew of the M/V AMERICAN CORMORANT violated multiple subsections of 33 CFR § 164.11 of the Navigation Safety Regulations, which read, in relevant part, as follows:

> The owner, master, or person in charge of each vessel underway shall ensure that:
> (a)  The wheelhouse is constantly manned by persons who:

(1) Direct and control the movement of the vessel; and

(2) Fix the vessel's position;

(b)  Each person performing a duty described in paragraph (a) of this section is competent to perform that duty;

(c)  The position of the vessel at each fix is plotted on a chart of the area and the person directing the movement of the vessel is informed of the vessel's position;

(d)  Electronic and other navigational equipment, external fixed aids to navigation, geographic reference points, and hydrographic contours are used when fixing the vessel's position;

(e)  Buoys alone are not used to fix the vessel's position;

Note: Buoys are aids to navigation placed in approximate positions to alert the mariner to hazards to navigation or to indicate the orientation of a channel. Buoys may not maintain an exact position because strong or varying currents, heavy seas, ice, and collisions with vessels can move or sink them or set them adrift. Although buoys may corroborate a position fixed by other means, buoys cannot be used to fix a position: however, if no other aids are available, buoys alone may be used to establish an estimated position.

(f)  The danger of each closing visual or each closing radar contact is evaluated and the person directing the movement of the vessel knows the evaluation . . . .

33 C.F.R. § 164.11(a)-(f).

9.      Captain Potter failed to (1) prepare a proper transit plan; (2) post a proper lookout; (3) identify and prevent the risk of collision or allision; (4) stop or avoid alliding with the Launchway; (5) use danger bearings, radar, ARPA, GPS, and other tools to navigate the vessel, and instead relied exclusively on a floating aid without cross checking it with some other available navigational references; (6) properly monitor the acts of the pilot; and (7) prepare or inform himself sufficiently to have the level of situational awareness or preparation necessary to properly manage the pilot.  As Master of the vessel, Captain Potter's negligence is imputed to Plaintiffs.  For these reasons, the Court concludes that there is a direct causal link

between Plaintiffs' violations of 33 C.F.R. § 164.11 and the damage to the M/V

AMERICAN CORMORANT, and that the violations of this regulation were causes

of the allision.  *See Stolt Achievement,* 447 F.3d at 364; *In re Mid-South Towing Co.*,

418 F.3d at 534.  Plaintiffs have not met their burden under *The Pennsylvania* Rule

of demonstrating that these violations could not have been a cause of the allision.

C.    Pilot Foster's Negligence

10.    As for Pilot Foster, the Fifth Circuit has explained that

> [t]he pilot's responsibilities are broad and he supersedes the
> master for the time being in the command and navigation of the ship and
> his orders must be obeyed in all matters connected with navigation.
> However, "the master is not wholly absolved from his duties while the
> pilot is on board and may advise him and even displace him in case he is
> intoxicated or manifestly incompetent.  He is still in command of the
> vessel, except so far as her navigation is concerned, and bound to see that
> there is sufficient watch on deck and that the men are attendant to their
> duties."

*Avondale v. International Marine Carriers, Inc.*, 15 F.3d 489, 492-93 (5th Cir. 1994)
(*quoting The OREGON*, 158 U.S. 186, 194-195 (1895)).

11.    Because a pilot is "selected for his personal knowledge of the

topography through which he steers his vessel," because of the "high compensation

they receive," because of the considerable value of the property "committed to their

control," and because pilots are characterized as "absolute masters," they are held

to a high degree of care.  *See Atlee v. Packet Co.*, 88 U.S. 389, 396-97 (1874).  In

*Atlee*, the Supreme Court summarized that knowledge that harbor pilots are

expected to have:

> [T]he pilot of a river steamer, like the harbor pilot, is selected for his
> personal knowledge of the topography through which he steers his vessel.

> In the long course of a thousand miles in one of these rivers, he must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the navigable channel is, in its relation to all these external objects, especially in the night. *He must also be familiar with all dangers that are permanently located in the course of the river*, as sand-bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of changes in the current of the river, of sand-bars newly made, of logs or snags, or other objects newly presented, against which his vessel might be injured.

*Atlee*, 88 U.S. at 396 (emphasis added).

12.     Compulsory pilots "must be held to an unusually high standard of care . . . ." *Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790, 798 n.6 (5th Cir. 1977). The Fifth Circuit has stated that "[a]bsent a finding of actual knowledge, the pilot may be charged with knowledge of a local condition as a matter of law." *Id.* In this case, the Court concludes that, as a matter of law, Pilot Foster actually knew, or at least should have known, the approximate location of the launchways, which had been permanently located in the Pascagoula River during his entire career as a pilot. He should further have been actually aware of the risk posed by taking a deep-draft vessel like the M/V AMERICAN CORMORANT outside the improved channel and in such close proximity to a privately-maintained obstruction buoy marking the known hazard. *See id.*

13.     Pilot Foster did not exercise the degree of care required of a pilot in similar circumstances, and was negligent in permitting the vessel to stray from the improved channel and strike Launchway Number 1 at a point some 70 feet outside

the improved channel.  *See Bethlehem Steel Corp. v. Yates*, 438 F.2d 798, 799 (5th

Cir. 1971) (affirming decision of district court that a harbor pilot negligently failed

to exercise the degree of care required of a harbor pilot in such circumstances,

proximately causing the collision); *Kingfisher Shipping v MV Klarendon*, 651 F.

Supp. 204, 207 (S.D. Tex. 1986) (stating that "due care and skill is required of a

compulsory pilot but not infallibility.").  The Court is further of the opinion that

Pilot Foster's negligence was a contributing, proximate, and legal cause of the

allision.

D.    Captain Potter's Negligence

14.    With respect to Captain Potter's responsibilities while Pilot Foster was

at the con, the Fifth Circuit has explained that "[t]he master is entitled to assume

that the pilot is an expert on local conditions and practices, until it becomes

manifest that the pilot is steering the vessel into danger."  *Avondale*, 15 F.3d at 493

(*citing Kim Crest, S.A. v. M/V SVERDLOVSK,* 753 F. Supp. 642, 646 (S.D. Tex.

1990)).  The fact that there was a pilot on board did not relieve Captain Potter from

his affirmative duty to exercise due care to assure the safety of his vessel.  A

vessel's master retains authority to countermand those orders of a pilot which

would place the vessel in a position of apparent and avoidable danger.  *See Delta*

*Transload, Inc. v. The Navios Commander*, 818 F.2d 445, 451 n.17 (5th Cir. 1987).

"If the master's responsibility to intervene in cases of great necessity means

anything, it must require that he have an adequate level of information to

determine when 'great necessity' arises," and the master must "pay attention so

that he [knows] that he [needs] to intervene." *Avondale Industries, Inc.*, 15 F.3d at

493. As the United States Supreme Court has stated,

> [t]here are many cases in which . . . , notwithstanding the pilot has
> charge, it is the duty of the master to prevent accident, and not to
> abandon the vessel entirely to the pilot; but that there are certain duties
> he has to discharge (notwithstanding there is a pilot on board) for the
> benefit of the owners . . . . [I]n well-conducted ships the master does not
> regard the presence of a duly-licensed pilot in compulsory pilot waters as
> freeing him from every obligation to attend to the safety of the vessel; but
> that, *while the master sees that his officers and crew duly attend to the
> pilot's orders, he himself is bound to keep a vigilant eye on the navigation
> of the [vessel] and, when exceptional circumstances exist, not only to urge
> upon the pilot to use every precaution, but to insist upon such being taken.*

*The Oregon*, 158 U.S. 186, 195 (*quoting The Batavier*, 1 Spinks, 378, 383; Mars.
Mar. Coll. 255) (emphasis added).

15. Captain Potter should have known that the M/V AMERICAN

CORMORANT had strayed some 70 feet outside the improved channel and into

water too shallow for her draft for a distance of over 250 feet before she struck the

Launchway. The Court concludes that, as a matter of law, Captain Potter failed to

pay attention and/or to ascertain an adequate level of information to determine

when "great necessity" arose in this case. *See Avondale Industries, Inc.*, 15 F.3d at

493. The evidence in this case, most notably Captain Potter's own testimony,

establishes that he did not adequately monitor Pilot Foster and, as a result, he

permitted the vessel to stray outside of the improved channel and allide with the

Launchway. Based upon a preponderance of the credible evidence, if Captain

Potter had adequately planned this transit and monitored and kept himself

informed of the position of his vessel, he would have known whether there was

sufficient water to navigate without having to depend on Pilot Foster.  The Court is of the opinion that Captain Potter was negligent in that he (1) did not exercise the degree of care required of a master in similar circumstances; (2) did not properly plan or make and keep himself adequately informed; (3) relied exclusively on the pilot; and (4) allowed the vessel to stray from the improved channel and strike Launchway Number 1.  The Court is further of the opinion that Captain Potter's negligence was a contributing, proximate, and legal cause of the allision.

E.    NGSS's Purported Negligence

16.    As discussed earlier, the Court concludes that NGSS was not negligent in this case.  While there is conflicting evidence, on the whole, the Court concludes that Plaintiffs have not carried their burden of proof on this point, and the record is insufficient to support a finding by a preponderance of the evidence that Launchway Number 1 exceeded its COE permitted length, or that Red Buoy No. 2 was out of position at the time of the allision.

F.    The STELLA MARIS Decision

17.    Throughout this litigation, Plaintiffs have placed great emphasis on the "STELLA MARIS decision," *American Zinc Co. v. Foster*, 313 F. Supp. 671 (S.D. Miss. 1970), wherein the Court determined that the failure of Ingalls, predecessor to NGSS, to properly maintain the buoy marking submerged Launchway Number 1 constituted negligence in causing an allision, while the pilot, the vessel, and the vessel's owner, crew, and agent were guilty of no negligence.  *See id.* at 684.  The Court is of the opinion that *American Zinc* is factually distinguishable from this

case in a number of important respects, and is therefore of little to no persuasive value based on the facts of this case.  The STELLA MARIS was a much smaller vessel than the M/V AMERICAN CORMORANT.  She had an overall length of approximately 400 feet and a 50 foot beam, and drew only 24 feet of water.  *See id.* at 675.  By comparison, the M/V AMERICAN CORMORANT had an overall length of approximately 738 feet and a 135 foot beam, and she drew over 33 feet of water.  The STELLA MARIS could arguably navigate outside the improved federal channel of the Pascagoula River, while the M/V AMERICAN CORMORANT was clearly limited to the improved channel due to her draft.

18.    The allision in *American Zinc* occurred at night, and it was undisputed that the light on Red Buoy No. 2 was not burning at the time.  Thus, the pilot and lookout had difficulty locating the buoy  *See id.* at 675-76.  The STELLA MARIS passed Red Buoy No. 2 abeam approximately 150 feet off its starboard side, and seconds later, the vessel violently collided with a submerged object, Launchway Number 1.  *See id.* at 676.  At the time of the allision, the pilot thought that the vessel was in the middle of the channel.  *See id.*  The buoy was determined to be approximately 125 feet out of position to the east.  *See id.* at 679.  In the present case, on a clear day with good visibility, Pilot Foster easily saw the buoy and yet permitted the M/V AMERICAN CORMORANT, a far longer and wider vessel with a much deeper draft, to come as close as fifteen (15) feet to a known, marked hazard.  The Court has already determined that the buoy was sufficiently marking the Launchway on the day of this allision.  In addition, the STELLA MARIS court found

no fault on the part of the pilot, master, or crew.  Here, the Court finds that the negligence of Pilot Foster and the Master were the direct causes, both in fact and in law, of the allision.  Neither took adequate steps to fulfill their responsibilities as they are defined by the law.  The direct result of their negligence was the allision.

19.     Plaintiffs have contended throughout that this Court should adopt the ruling in *American Zinc*, on the basis of *stare decisis* or collateral estoppel, to find that the Launchway was beyond the COE permitted length.  The Court need not resolve this question, as it has found that the length of Launchway Number 1 was not and could not have been the cause in fact of the allision in this case.  Regardless of the Launchway's length, Plaintiffs have not shown that Red Buoy No. 2 was out of position or that it was not properly marking the Launchway at the time of this incident.

G.     Recovery of Damages

20.     When a damaged vessel is not a total loss, as in this case, the owner is entitled to recover the reasonable cost of repairs necessary to restore it to its condition prior to the casualty.  *See Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999).  "Full compensation has long been recognized as a basic principle of admiralty law, where '[r]estitutio in integrum* is the leading maxim applied by admiralty courts to ascertain damages resulting from a collision.'" *City of Milwaukee v. Cement Div., Nat. Gypsum Co.*, 515 U.S. 189, 195-96 (1995) (*quoting Standard Oil Co. of N.J. v. Southern Pacific Co.*, 268 U.S. 146, 158 (1925)).  Profits that reasonably can be determined to have been lost during the

period of detention for repair may also be recovered. *See In re M/V Nicole Trahan,* 10 F.3d 1190, 1194-95 (5th Cir. 1994). The party at fault for a maritime casualty bears the costs of damage surveys, like any other actual damages, and the resulting travel expenses of the survey are recoverable as damages, if the travel costs incurred were necessary. *See id.* at 1196. The Court is of the opinion that Plaintiffs are entitled to the cost of repairs required as a result of the allision, including the cost of temporary repairs performed in Pascagoula and Mobile, and related costs, and permanent allision-related repairs performed in Tampa, and related costs. The Court finds and concludes that the total cost of repairs required as a result of the allision was $1,019,420.46.

21.     Under the *restitutio in integrum* theory of recovery in marine collision cases, the owners of a damaged vessel are often entitled to recover for loss of the vessel's use while laid up for repairs, where loss of earnings is shown. *See Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 669 (5th Cir. 1996) (internal citations omitted). Loss of hire or loss of use of the vessel pending repairs arising from an allision is a proper element of damage, provided that profits are proved with reasonable certainty. *See Delta S.S. Lines v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1000 (5th Cir. 1984), *modified in part on rehearing*, 753 F.2d 378 (5th Cir. 1985). This necessitates a showing that the vessel "has been engaged, or was capable of being engaged in a profitable commerce." *Id.* at 1001 (*quoting THE CONQUEROR*, 166 U.S. 110, 125 (1897)). It is not required that the vessel owner "prove that specific cargos were not carried because of the casualty." *Id.* To require

such proof "would impose an onerous burden not called for in this type of case" and "would be a rejection of the time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after." *Id.* (internal citations omitted). "Uncontroverted proof that the shipowner's vessel operated in an active market is sufficient to establish lost profits." *See Maritrans Operating Partners, LP v. Port of Pascagoula,* 73 Fed. App'x 733, 734 (5th Cir. 2003) (*citing Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984); *Skou v. United States*, 526 F.2d 293, 298 (5th Cir. 1976)). In this case, the Court finds and concludes that Plaintiffs are entitled to recover loss of hire damages only from the date of the allision until the completion of repairs, which Mr. Fiske testified was 25.9 days. Mr. Fiske acknowledged at trial that Plaintiffs have previously been compensated for additional days lost for storm avoidance for Hurricane Ivan after the repairs were completed.

22.   As discussed in the Court's Findings of Fact, Mr. Fiske testified to various time charter equivalents which could be appropriate to use in this case to estimate damages for loss of hire. Under the traditional "three voyage rule," "the court determines the charter hire rate for the voyage immediately preceding the collision, the charter hire rate during the voyage of the casualty, and the charter hire rate of the first voyage succeeding the casualty and averages them." *Marine Transport Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140-41 (5th Cir. 1994) (*quoting Kim Crest, S.A. v. M.V. Sverdlovsk*, 753 F. Supp. 642, 650 (S.D. Tex.

1990)); *see Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1001 (5th Cir. 1984) (noting the "time honored rule in maritime cases that a proper method of determining lost detention profits is to seek a fair average based on a number of voyages before and after").  With this calculation, an average revenue per voyage is determined, which is then reduced by the estimated average variable costs associated with those three voyages, and by a probable utilization rate.  *See Marine Transport Lines,* 37 F.3d at 1140-41.  Because the M/V AMERICAN CORMORANT was detained for only 25.9 days, which is less than any voyage for the vessel during 2004, the year of the allision, *see* Cormorant Voyage BVA Report, Ex. P-237, the Court is of the opinion that the "three voyage rule" should be applied here, *see Marine Transport Lines*, 37 F.3d at 1140-41.

23.    The Court concludes that the appropriate voyages for calculating loss of use damages under the three voyage rule in this case are Voyages 5, 6, and 7, as described in the Cormorant Voyage BVA Report, Ex. P-237.  The Court finds credible the testimony of Mr. Fiske, who calculated that the daily time charter equivalent for these three voyages was $19,486.80.  Multiplying the 25.9 days of detention by the rate of $19,486.80, the Court concludes that Plaintiffs are entitled to recover $504,708.12 for loss of hire of the M/V AMERICAN CORMORANT during the detention required for repairs related to this allision.

24.    Based on the foregoing, the Court concludes that Plaintiffs' total damages attributable to the allision, and therefore recoverable in this case, are $1,524,128.58.

H.    Comparative Fault

25.    The Supreme Court announced the comparative fault rule in maritime

cases in *United States v. Reliable Transfer Co.*, 421 U.S. 397 (1975).  This rule

requires that damages be assessed on the basis of proportionate fault, when such

allocation can reasonably be made.  *See McDermott, Inc. v. AmClyde*, 511 U.S. 202,

207 (1994).  "Apportionment is not a mechanical exercise that depends upon

counting up the errors committed by both parties.  The trial court must determine,

based upon the number and quality of faults by each party, the role each fault had

in causing the collision."  *Stolt Achievement, Ltd.*, 447 F.3d at 370 (*citing United

Overseas Export Lines, Inc. v. Medluck Compania Maviera*, 785 F.2d 1320, 1325-26

(5th Cir. 1986)).

26.    In this case, the Court is of the opinion that it is possible to fairly

measure the comparative degree of the relevant parties' fault.  *See Reliable

Transfer*, 421 U.S. at 411.  Based on a preponderance of the evidence, and based on

the factual findings and legal conclusions discussed earlier herein, the Court

concludes that fault for the allision in this case should be allocated as follows:

| | | |
|---|---|---|
| NGSS | 0 | % |
| Pilot Foster | 50 | % |
| Plaintiffs | 50 | % |

27.    Multiplying the allocation of fault by $1,524,128.58, the total amount

of damages attributable to the allision, results in damages of $762,064.29

attributable to Pilot Foster's conduct, with the remainder attributable to Plaintiffs'

own negligence.

I.    Prejudgment Interest

28.    Admiralty has a "traditional hospitality to prejudgment interest . . . ." *City of Milwaukee v. Cement Div., National Gypsum Co.,* 515 U.S. 189, 196 (1995). The general rule in admiralty is to permit interest from the date of collision, except where peculiar circumstances warrant awards only from the date of judgment.  *See Mobil Oil Corp. v. Tug Pensacola*, 472 F.2d 1175, 1176 (5th Cir. 1973).  "By compensating for the loss of use of money due as damages from the time the claim accrues until judgment is entered, . . . an award of prejudgment interest helps achieve the goal of restoring a party to the condition it enjoyed before the injury occurred . . . ."  *City of Milwaukee,* 515 U.S. at 196 (internal quotation and citations omitted).  Such an award, however, is not an absolute right.  *See id.*  In this case, the Court concludes that there was no undue delay in prosecuting the lawsuit, and that prejudgment interest is therefore appropriate.  *See id.*  Because there are no peculiar circumstances in this case, it is appropriate to award prejudgment interest from the date of the incident, August 15, 2004.

29.    "Setting the rate of interest on a judgment is within the 'broad discretion' of the district court."  *See United States v. Central Gulf Lines, Inc.*, 974 F.2d 621, 630 (5th Cir. 1992) (*citing Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986)).  "The district court is entitled to look to 'the judgment creditor's actual cost of borrowing money or to other reasonable guideposts indicating a fair level of compensation.'" *Id.* (*citing Bosnor, S.A. De C.V. v. Tug L.A.*

*Barrios*, 796 F.2d 776, 786 (5th Cir. 1986)).  "Where plaintiffs have failed to provide evidence that they had actually borrowed money and incurred higher interest costs, [the Fifth Circuit] has generally rejected plaintiffs' arguments that they should have been awarded prejudgment interest at a higher rate."  *Id.* at 630-31.  Plaintiffs in this case have not shown that they have incurred higher interest costs than those afforded by federal statute.  In the Court's view, the federal rate established pursuant to 28 U.S.C. § 1961 adequately compensates Plaintiffs for the losses they have suffered.  *See In re M/V NICOLE TRAHAN*, 10 F.3d 1190, 1196 (5th Cir. 1994).  Prejudgment interest will be awarded at the rate prescribed by 28 U.S.C. §1961(a) from August 15, 2004, to the date of entry of judgment in this case.

30.     The Court therefore awards damages in favor of Plaintiffs and against Defendant Pilot Foster in the amount of $762,064.29, plus prejudgment interest at the rate provided in 28 U.S.C. §1961(a), from August 15, 2004, until the date of judgment in this case.

31.     The weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System pursuant to 28 U.S.C. § 1961, was 2.05% per annum for the week ending September 12, 2008, the calendar week preceding the date of judgment in this case.  From August 15, 2004, through September 18, 2008, is 1,495 days.  Based on damages of $762,064.29, the amount of prejudgment interest accrued to date is $63,987.30, making the Court's total award of damages in favor of Plaintiffs and against Defendant Pilot Foster $826,051.59.

J.    Third-Party Claims

32.    As noted earlier, during the pendency of this lawsuit Defendants USA and NGSS asserted Third-Party Complaints.  The Government's Third-Party Complaint was filed against M/V AMERICAN CORMORANT, *in rem*, on September 18, 2006 [92-1], and NGSS's Third-Party Complaint was filed against M/V ASIAN ATLAS (ex M/V AMERICAN CORMORANT), *in rem*, on October 11, 2006 [113-1].  The record reflects that neither Third-Party Complaint has ever been served upon the Third-Party Defendants.  The Court therefore concludes that these Third-Party Complaints [92-1], [113-1], should be dismissed, without prejudice.

IV.  CONCLUSION

For the reasons discussed herein, the Court finds that the accepted facts and law support the conclusion that Plaintiffs and Defendant Pilot Foster are each 50% at fault for the allision which is the subject of this case.  Accordingly, Plaintiffs are entitled to judgment against Defendant Pilot Foster, and to recover $762,064.29 in damages, plus prejudgment interest of $63,987.30, for a total judgment of $826,051.59.  Plaintiffs also are entitled to recover post-judgment interest from Defendant Pilot Foster as prescribed by 28 U.S.C. §1961.  Plaintiffs are entitled to recover no damages as against Northrop Grumman Ship Systems, Inc., and their claims against this Defendant must be dismissed with prejudice.  A separate Final Judgment in conformity with and incorporating by reference the foregoing Findings of Fact and Conclusions of Law shall issue this date.

**IT IS, THEREFORE, ORDERED AND ADJUDGED**, that for the reasons stated herein, Plaintiffs are entitled to recover from Defendant Pilot Don Foster damages in the amount of $826,051.59, plus post-judgment interest as prescribed by 28 U.S.C. §1961.

**IT IS, FURTHER, ORDERED AND ADJUDGED**, that for the reasons stated herein, Plaintiffs' claims against Defendant Northrop Grumman Ship Systems, Inc., should be and are hereby **DISMISSED WITH PREJUDICE**.

**IT IS, FURTHER, ORDERED AND ADJUDGED**, that for the reasons stated herein, Defendant USA's Third-Party Complaint filed against M/V AMERICAN CORMORANT, *in rem*, on September 18, 2006 [92-1], and Defendant Northrop Grumman Ship Systems, Inc.'s, Third-Party Complaint filed against M/V ASIAN ATLAS (ex M/V AMERICAN CORMORANT), *in rem*, on October 11, 2006 [113-1], both should be and are hereby **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED AND ADJUDGED**, this the 18th day of September, 2008.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE